**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**CLEVELAND DIVISION**

| | | |
|---|---|---|
| JASMINE LAWRENCE, individually and on behalf of all similarly situated individuals, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:12-cv-02600-CAB |
| | ) | |
| vs. | ) | Honorable Christopher A. Boyko |
| | ) | |
| MAXIM HEALTHCARE SERVICES, INC., a Maryland Corporation, | ) ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION, COURT-SUPERVISED NOTICE TO POTENTIAL OPT-IN PLAINTIFFS PURSUANT TO 29 U.S.C. § 216(b), AND EXPEDITED DISCOVERY**

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................ 1

II.    FACTUAL BACKGROUND ............................................................................... 2

III.   STANDARD GOVERNING SECTION 216(b) CERTIFICATION ...................................... 5

    A.    The Purpose Of Court-Authorized Notice Is To Promote Efficiency Where A Class Of "Similarly Situated" Employees Exists............................................... 5

    B.    Plaintiff Has The Burden Of Making A Factual Showing That The Proposed Class Is Similarly Situated ................................................................................ 5

IV.   CONDITIONAL CERTIFICATION SHOULD BE DENIED........................................... 7

    A.    Plaintiff Has No Basis In Fact Or Law To Seek A Broad Class Of "In-Home Health Care Workers."..................................................................................... 7

    B.    Even If Plaintiff's Proposed Class Were Limited To HHAs, Plaintiff Has Failed To Demonstrate That She And The Opt-In Plaintiffs Are  Similarly Situated To The Members Of The Proposed Class................................................. 8

         1.    Each Patient Has A Unique Plan Of Care And, Therefore, The HHA's Duties Vary From Patient To Patient.............................................................. 9

         2.    The Time Spent On Various Duties Performed By The HHAs Varies From Patient To Patient ........................................................................... 11

         3.    The Number Of Patients Assigned To An HHA May Dictate The Types Of Duties Performed, And How Often They Are Performed ........... 12

         4.    The HHA's Duties Vary Depending On The Program Or Policy That Covers The Patient ................................................................................. 12

         5.    The HHAs' Schedules Vary And Impact The Type Of Work That They Perform ....................................................................................... 13

         6.    The Patient's Environment Also Impacts The Types Of Duties The HHAs Perform ....................................................................................... 13

         7.    The HHAs' Training Varies By Location.................................................... 14

    C.    Evaluating The Applicability Of The Companionship Services Exemption To Each HHA Will Require Highly Individualized Determinations ............................ 14

    D.    Putative Class Members Are Not Similarly Situated As To A Uniform Illegal Policy ............................................................................................................. 20

         1.    The Classification Of All HHAs As Exempt Does Not Constitute A Common Unlawful Policy That Warrants Conditional Certification ........... 20

         2.    Job Postings Do Not Constitute A Common Policy That Warrants Conditional Certification .......................................................................... 21

V.    Plaintiff's Proposed Form And Method Of Notice Is Inappropriate ..................................... 23

i

# TABLE OF CONTENTS
(continued)

**Page**

VI.    Proposed Putative Class Members' Personal Identifying Information Should Not Be Provided To Plaintiff's Counsel.........................................................................................24

VII.   CONCLUSION ..............................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Adair v. Wis. Bell, Inc.*,
No. 08-C-280, 2008 WL 4224360 (E.D. Wis. Sept. 11, 2008)................................................. 5

*Armstrong v. Weichert Realtors*,
No. 05-3120, 2006 WL 1455781 (D.N.J. May 19, 2006)........................................................ 9

*Arrington v. Mich. Bell Tel. Co.*,
No. 10-10975, 2011 WL 3319691 (E.D. Mich. Aug. 1, 2011)............................................ 5, 6

*Baden-Winterwood v. Life Time Fitness*,
2:06 CV 99, 2006 WL 2225825 (S.D. Ohio Aug. 2, 2006) .................................................. 23

*Basco v. Wal-Mart Stores, Inc.*,
No. Civ. A. 00-3184, 2004 WL 1497709 (E.D. La. July 2, 2004)......................................... 6

*Beetler v. Trans-Foam, Inc.*,
5:11CV132, 2011 WL 6130805 (N.D. Ohio Dec. 8, 2011)................................................. 23

*Bunyan v. Spectrum Brands, Inc.*,
No. 07-CV-0089-MJR, 2008 WL 2959932 (S.D. Ill. July 31, 2008) ........................ 17, 20, 22

*Burdine v. Covidien, Inc.*,
10-CV-194, 2011 WL 2971186 (E.D. Tenn. July 21, 2011) ................................................ 23

*Carlson v. Leprino Foods, Co.*,
No. 1:05-CV-798, 2006 WL 1851245 (W.D. Mich. June 30, 2006).................................... 23

*Cason v. Vibra Healthcare*,
No. 10-10642, 2011 WL 1659381 (E.D. Mich. May 3, 2011) .............................................. 6

*Colson v. Avnet, Inc.*,
687 F. Supp. 2d 914 (D. Ariz. 2010) ............................................................................. 21, 22

*Dellarussiani v. Ed Donnelly Enters, Inc.*,
468 F. App'x. 479 (6th Cir. 2012) .................................................................................... 6

*Espenscheid v. DirectSat USA, LLC*,
No. 09-625, 2010 WL 2330309 (W.D. Wis. June 7, 2010) ................................................ 24

*Forney v. TTX Co.*,
No. 05 C 6257, 2006 WL 1030194 (N.D. Ill. Apr. 17, 2006)............................................. 22

*Gonzales v. Hair Club for Men Ltd., Inc.*,
*No. 6:06-cv-1762-Orl-28JGG, 2007 WL 1079291 (M.D. Fla. Apr. 9, 2007)* ......................... 9

*Harrison v. McDonald's Corp.*,
    411 F. Supp. 2d 862 (S.D. Ohio 2005) .................................................................... 5

*Hoffman-La Roche Inc. v. Sperling*,
    493 U.S. 165 (1989) .................................................................................................. 5

*Holt v. Rite Aid Corp.*,
    333 F. Supp. 2d 1265 (M.D. Ala. 2004) ..................................................... 5, 16, 20

*Howard v. Securitas Sec. Servs., USA Inc.*,
    No. 08-2746, 2009 WL 140126 (N.D. Ill. Jan. 20, 2009) ...................................... 24

*Johnson v. Bridges of Ind., Inc.*,
    No. 2:10-cv-153-WTl-WGH, 2010 U.S. Dist. LEXIS 103696 (Sept. 28, 2010) ............. 17, 21

*Lindberg v. UHS of Lakeside, LLC*,
    761 F. Supp. 2d 752 (W.D. Tenn. 2011) ............................................................... 23

*Mathews v. ALC Partner, Inc.*,
    2:08-CV-10636, 2009 WL 2591497 (E.D. Mich. Aug. 24, 2009) ........................... 23

*Moore v. PNC Bank, N.A.*,
    No. 12-1135 (W.D. Penn. May 29, 2013) .............................................................. 21

*Myers v. Hertz Corp.*,
    624 F. 3d 537 (2d Cir. 2010) .................................................................................... 5

*Nogueda v. Granite Masters, Inc.*,
    No. 2:09-CV-374, 2010 WL 1521296 (N.D. Ind. Apr. 14, 2010) ............................. 6

*O'Brien v. Ed Donnelly Enters., Inc.*,
    575 F.3d 567 (6th Cir. 2009) ............................................................................. 6, 20

*Oetinger v. First Residential Mortg.Network*,
    No. 3:60-CV-381-H, 2009 WL 2162963 (W.D. Ky. July 16, 2009) ....................... 20

*Olivo v. GMAC Mortg. Corp.*,
    374 F. Supp. 2d 545 (E.D. Mich. 2004) ............................................................. 6, 20

*Persin v. Career Builders, LLC*,
    No. 05 C 2347, 2005 U.S. Dist. LEXIS 23095 (N.D. Ill. Sept. 21, 2005) .............. 22

*Rutledge v. Claypool Elec., Inc.*,
    No. 2:12–cv–0159, 2013 WL 435058 (S.D. Ohio Feb. 5, 2013) ............................ 17

*Severin v. Project OHR, Inc.*,
    No. 1:10-cv-09696-DLC .................................................................................. 18, 19

*Shipes v. Amurcon Corp.*,
    10-14943, 2012 WL 1720615 (E.D. Mich. May 16, 2012) .................................... 23

*Snide v. Disc. Drug Mart, Inc.*,
　　1:11CV0244, 2011 WL 5434016 (N.D. Ohio Oct. 7, 2011) (N.D. Ohio Nov. 8, 2011) ........ 23

*Songer v. Sillon Res., Inc.*,
　　569 F. Supp. 2d 703 (N.D. Tex. 2008) ................................................................ 9

*Trinh v. JP Morgan Chase & Co.*,
　　No. 07-1666, 2008 WL 1860161 (S.D. Cal. Apr. 22, 2008) ........................................ passim

*Vennett v. Am. Intercont'l Univ. Online*,
　　No. 05-4889, 2006 WL 908030 (N.D. Ill. Apr. 5, 2006) ...................................................... 24

*West v. Border Foods, Inc.*,
　　No. 05-2525, 2006 WL 1892527 (D. Minn. July 10, 2006) ................................................... 6

*Xavier v. Belfour USA Group, Inc.*,
　　585 F. Supp. 2d 873 (E.D. La. 2008) ................................................................ 6

## STATUTES

29 U.S.C. § 213 ....................................................................................................... 20

29 U.S.C. § 213(a)(15) ............................................................................................. 15

29 U.S.C. § 216(b) ................................................................................................... 20

*29 U.S.C. § 216(b)* ................................................................................................. 20

## OTHER AUTHORITIES

29 C.F.R. § 552.6 ................................................................................................... 16

29 C.F.R. § 552.6 ............................................................................................... 15, 19

## I.  __INTRODUCTION__

Plaintiff was formerly employed as a Home Health Aide ("HHA") for Defendant Maxim Healthcare Services, Inc. ("Maxim" or "Defendant"), reporting to its Mansfield, Ohio office, and now seeks conditional certification of a nationwide class consisting of "all hourly in-home health care workers," which includes HHAs, nurses, therapists, and medical social workers (Motion "Mot." at 2), despite the fact that she and the two other declarants were employed as HHAs. *See* Mot. Exs. D-E. The essence of Plaintiff's brief legal analysis is that the "evidentiary burden at this stage is not a heavy one," and, therefore, the Court should grant the Motion almost as a matter of right. *See* Mot. at 7 (citation omitted). Plaintiff's argument fails for multiple reasons.

First, Plaintiff's purported class is unreasonable, impermissibly broad and without any support. The sparse evidence that Plaintiff proffers in support of her Motion relates solely to the HHA position; she offers no evidence whatsoever relating to nurses, therapists, medical social workers or any other in-home health care workers. *See, e.g.*, Mot. Exs. C-H. Furthermore, the essence of Plaintiff's FLSA claim is that she and other *HHAs* nationwide were misclassified as exempt under the *companionship services exemption* of the FLSA, because they allegedly performed general household work more than 20 percent of the time. *See* Sec. Am. Compl. ¶¶ 15-26, 33-34. Notwithstanding these facts, Plaintiff seeks an impermissibly broad class consisting of other job classifications, including nurses, therapists and medical social workers. *See infra* § 4(A).

Second, Plaintiff has failed to show that HHAs, let alone all hourly in-home health care workers, nationwide are similarly situated on material issues such that a collective action would advance judicial efficiency.

Third, the central issue in this case is whether HHAs qualify for the FLSA's companionship services exemption. *See* Sec. Am. Compl. ¶¶ 15-26, 33-34. That issue will require individualized inquiries into each HHA's actual day-to-day duties on a weekly basis; it is not a one-time

determination. Tellingly, Plaintiff fails even to identify the exemption at issue in her Motion, let alone discuss how common evidence can be used to satisfy its components.

Fourth, conditional certification should be denied because Plaintiff fails to establish that she and the proposed putative class were "victims of a common policy or plan *that violated the law*." Mot. at 7 (emphasis added; citation omitted). Plaintiff argues that conditional certification is warranted because Maxim "refus[ed] to pay overtime" and instead paid Plaintiff and other "In-Home Health Care Workers" straight time for all hours worked. *See* Mot. at 10-11. Courts have repeatedly rejected the very same argument, because blanket exemptions do not control how employees actually spend their time and, therefore, do not reduce the individualized inquiries necessary to evaluate the exemption.

Ultimately, armed with little more than her own cursory, summary allegations and nearly identical declarations from two others, Plaintiff has sought to certify a *nationwide* collective action consisting of <u>tens of thousands of employees</u>. The authorities relied upon by Plaintiff in her Motion, together with a review of applicable FLSA collective action jurisprudence, demonstrate that there is no reasonable basis or authority for the certification, notice or expedited discovery sought by Plaintiff. Therefore, this Court should deny Plaintiff's Motion.

## II.     FACTUAL BACKGROUND

Maxim is a nationwide provider of home healthcare, medical staffing, and wellness services for individuals with chronic conditions, recovering from illness, or in need of daily assistance. *See* Decl. Markewicz ¶ 3.[1] Maxim provides its patients with in-home placement of HHAs to provide personal care services, including, but not limited to: bathing; hair care; nail care; shaving; dressing; bathroom activities; skin care; positioning/placing patients; assisting with ambulation and transfer of patients; assisting patients with exercise; meal preparation and feeding; maintaining a safe and

---

[1] Declaration of Jeremy Markewicz ("Decl. Markewicz") is attached hereto as Exhibit A.

sterile environment; and keeping the patient clean and bandaged to avoid infection.  *Id.* at ¶ 3.  The

HHAs provide in-home patient care under the supervision of a Registered Nurse ("RN").  *Id.*  Each

Maxim office hires its own RNs to perform new hire and annual training for HHAs, with some

HHAs participating in monthly training.  *Id.* at ¶ 4.  Each training emphasizes different duties and

results in different amounts of time being spent on different tasks.  *Id.*

Maxim currently has approximately 300 HHA staffing locations nationwide, including 15 in

Plaintiff's state of Ohio.  *Id.* at ¶ 3.  Each staffing location oversees, among other duties: new

patient intake, patient complaints and concerns, HHA orientation and training, assignments and

schedules.  *Id.*  Since 2009, Maxim has employed more than 14,000 individuals as HHAs

nationwide – more than 4,000 in Ohio alone.[2]  *Id.*

Maxim contracts with hundreds of state and federal government agencies and private

insurers to provide care to patients covered by applicable state or federal programs or insurance

policies.  *Id.* at ¶ 5.  Each government program is uniquely funded by federal and state governments,

and defines what types of services may be provided with such funds.  The various state and federal

agencies and insurance companies identify patients who qualify for services under their applicable

criteria, and they contract with Maxim to provide those services within the parameters of the

applicable program or policy.  For example, in Ohio alone, Maxim serves patients under the

following programs: Medicaid, Passport Program, private insurance, Care Source, workers'

compensation, and the Care Star Waiver Program.  *Id.*  Each state has unique programs with their

own guidelines and restrictions regarding the duties that the HHA may perform for qualified

patients.  *Id.*  The program (and funding source), not Maxim, determines the duration of time that an

HHA will spend with a patient and the types and nature of services that may be provided.  *Id.*

---

[2] Plaintiff and the declarants were all employed as HHAs.  Mot. Exs. C-E.  Maxim also employs individuals as Certified
Nursing Assistants ("CNAs") and State Certified Nursing Assistants ("STNAs") in part due to varying certification
standards around the country.  When combined, the HHAs, CNAs and STNAs total more than 50,000 going back to
2009.

HHAs, including Plaintiff, work in patients' homes to provide personal care as outlined in each patient's unique plan of care. *Id.* at ¶ 6. The plan of care takes into account the patient's specific medical needs as determined by the patient's physician. *Id.* Each plan of care is unique to the patient's medical condition, abilities and needs, and each plan of care specifies different types of duties that an HHA must perform in order to properly care for the patient. *Id.* Because each provider details the services that it will fund, Maxim has a strictly enforced policy that HHAs are not to deviate from the plan of care, which is administered and regularly reviewed and updated by an RN employed by Maxim and sometimes a case manager employed by the provider. *Id.; see also* HHA Plan of Care Policy, attached hereto as Ex. B. If a plan of care does not prescribe a specific duty, then the HHA is not authorized to perform that duty. *Id.* at ¶ 6. If an HHA is asked to perform work not detailed in the plan of care, the HHA must notify the branch office. *Id.* The plan of care is reviewed and updated at least every 60 days, and HHAs are required to review and comply with it. *Id.*

After the plan of care is prepared in accordance with the physician's report, the patient is assigned to an HHA based on geographic proximity and availability. *Id.* at ¶ 7. HHAs can turn down a patient assignment. *Id.* HHAs may also supplement their income by agreeing to take "fill-in" assignments where they substitute for another HHA. *Id.* These jobs vary depending on need, and HHAs who perform fill-in work often attend to different patients from week to week. *Id.*

HHAs provide a variety of different services to their patients, depending on the patients' needs and plan of care, and the applicable program. *Id.* at ¶ 8. In caring for a patient, HHAs fill out daily paperwork wherein the HHA identifies the duties performed in caring for the patient, as well as the HHA's time-in, time-out, and total hours for each day. *Id.* The patient must sign the paperwork as well. The daily paperwork allows Maxim to compensate HHAs for all hours worked, verify that the work has been performed to the patient's satisfaction and bill the applicable program

4

or provider for the HHAs' services.  *Id.*  Other than general oversight by the RN and sometimes a

case manager, the HHAs are unsupervised.  *Id.* at ¶ 9.  The HHA is part of a healthcare team that

consists of physicians, an RN and a case manager.  *Id.*  In addition to HHAs, Maxim's in-home

health care workers also include skilled nurses, therapists, and medical social workers.  *Id.*

## III.    STANDARD GOVERNING SECTION 216(b) CERTIFICATION

### A.    The Purpose Of Court-Authorized Notice Is To Promote Efficiency Where A Class Of "Similarly Situated" Employees Exists.

As Plaintiff concedes, the touchstone for conditional certification is judicial efficiency.  *See*

*Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989); *see generally Arrington v. Mich. Bell*

*Tel. Co.*, No. 10-10975, 2011 WL 3319691, at *3 (E.D. Mich. Aug. 1, 2011).  Yet the means to

promote this efficiency is not, as Plaintiff suggests, to rubber-stamp conditional certification

motions based on self-serving and conclusory declarations; rather, courts should not exercise their

discretion to authorize notice unless a class of "similarly situated" aggrieved employees exists.

*Hoffman-La Roche*, 493 U.S. at 170.  Otherwise, "it is doubtful that [FLSA] § 216(b) would further

the interests of judicial economy, and it would undoubtedly present a ready opportunity for abuse."

*Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1270 (M.D. Ala. 2004).  If the Court must adjudicate

the claims of each HHA individually in one lawsuit, judicial efficiencies will not result.  *See, e.g.*,

*Adair v. Wis. Bell, Inc.*, No. 08-280, 2008 WL 4224360, at *4 (E.D. Wis. Sept. 11, 2008).

### B.    Plaintiff Has The Burden Of Making A Factual Showing That The Proposed Class Is Similarly Situated.

Consistent with judicial efficiency considerations, the burden is on Plaintiff to prove that

other employees are similarly situated.  *See Harrison v. McDonald's Corp.*, 411 F. Supp. 2d 862,

870-71 (S.D. Ohio 2005).  Plaintiff's burden of demonstrating that others are "similarly situated"

must be based on some substance and not mere "unsupported assertions."  *See Myers v. Hertz*

*Corp.*, 624 F.3d 537, 555 (2d Cir. 2010).  Courts in this Circuit are in accord that in the first-stage,

5

"although [the] standard is lenient, conclusory allegations are insufficient to support conditional certification."  *Arrington*, 2011 WL 3319691, at *4; *see also Cason v. Vibra Healthcare*, No. 10-10642, 2011 WL 1659381, at *3 (E.D. Mich. May 3, 2011); *accord Basco v. Wal-Mart Stores, Inc.*, No. 00-3184, 2004 WL 1497709, at *7 (E.D. La. July 2, 2004) ("While it is true that this 'lesser' standard should not preclude certification . . . plaintiffs have failed in their burden of proof to demonstrate identifiable facts or legal nexus that binds the claims so that hearing the cases together promotes judicial efficiency.").

Potential plaintiffs are "similarly situated" for purposes of FLSA Section 216(b) when they together were "victims of a common policy or plan that *violated the law*."  *See Olivo v. GMAC Mortg. Corp.*, 374 F. Supp. 2d 545, 548 (E.D. Mich. 2004) (internal quotations and citations omitted; emphasis added); *Cason*, 2011 WL 1659381, at *3 (alleged common policy cited by plaintiffs – automatic meal break deduction – was not itself an FLSA violation and therefore not sufficient to warrant conditional certification).  "[I]t is clear that plaintiffs are similarly situated when they suffer from a single, *FLSA-violating policy*, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs."  *O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 585 (6th Cir. 2009) (emphasis added), *aff'd sub nom. Dellarussiani v. Ed Donnelly Enters., Inc.*, 468 F. App'x 479 (6th Cir. 2012).  Even at the initial stage of the certification inquiry, "neither the remedial purposes of the FLSA, nor the interests of judicial economy, would be advanced if we were to overlook facts which generally suggest that a collective action is improper."  *West v. Border Foods, Inc.*, No. 05-2525, 2006 WL 1892527, at *7 (D. Minn. July 10, 2006).

The modest factual showing requirement is "not a mere formality."  *Nogueda v. Granite Masters, Inc.*, No. 09-374, 2010 WL 1521296, at *2 (N.D. Ind. Apr. 14, 2010); *Xavier v. Belfour USA Grp., Inc.*, 585 F. Supp. 2d 873, 878 (E.D. La. 2008).  Plaintiff's contention that the Court

6

should grant conditional certification based on her meager showing is misguided. Before Plaintiff's claims can be conditionally certified, there must be some evidence that (1) the putative class members were subject to a common and allegedly unlawful policy or practice, and (2) that any claimed FLSA violations resulting from that common policy or practice can be established through common proof. Plaintiff has failed to present such evidence, and her Motion should be denied.

## IV.    CONDITIONAL CERTIFICATION SHOULD BE DENIED

### A.    Plaintiff Has No Basis In Fact Or Law To Seek A Broad Class Of "In-Home Health Care Workers."

Plaintiff has provided *absolutely no basis* for seeking to conditionally certify a class of all in-home health care workers. What little evidence Plaintiff has presented relates solely to the HHA position; yet, without explanation, Plaintiff seeks to conditionally certify a far broader class of health care workers that includes a number of other job categories. *See, e.g.*, Mot. Exs. C-H.

Plaintiff and the declarants all worked for Maxim as HHAs, and the scant documents she relies upon to support her Motion relate to HHAs. *See id.* Plaintiff's FLSA claim is that she and other *HHAs* nationwide were misclassified as exempt under the companionship services exemption and improperly denied overtime. *See* Sec. Am. Compl. ¶¶ 15-26, 33-34. In what can only be perceived as an attempt to confuse the Court in order to secure a broader class, Plaintiff's Motion uses the terms "In-Home Health Care Workers" and "Home Health Aide" interchangeably, settling upon the broader group as the identified class.[3] However, Plaintiff acknowledges that the class of "in-home health care workers" encompasses at least four different positions (HHAs, skilled nurses, therapists and medical social workers). *See* Sec. Am. Compl. ¶ 10. Plaintiff's attempt to

---

[3] For example, Plaintiff alleges that "Defendant maintains a policy that requires all of its In-Home Health Care *Workers* to complete and submit 'Weekly Notes,' which state the time they arrived and departed a client's home, and the tasks performed under the headings of Bathing, Personal, Mobility, Housekeeping, Nutrition, and Toileting/Elimination." *See* Mot. at 3 (emphasis added) (citing Sec. Am. Compl. ¶ 19; Exhibit G). However, Defendant's Second Amended Complaint ¶ 19 actually alleges that "Defendant requires its Home Health *Aides* to complete and submit a "Weekly Note" detailing the time they arrived and departed a client's home; the tasks they performed, under the headings of Bathing, Personal, Mobility, Housekeeping, Nutrition, and Toileting/Elimination." Sec. Am. Compl. ¶ 19 (emphasis added). Plaintiff's Motion is replete with similar examples. *See, e.g.*, Motion at 9, 10, 15.

conditionally certify such a broad class flies in the face of the Court's April 26, 2013 Order, in which the Court denied Plaintiff's previous Motion for Conditional Certification (Dkt. No. 19) as moot, noting that (1) plaintiff was an "in-home health aid," (2) seeking to conditionally certify "[a]ll hourly in-home health care workers," yet (3) the complaint defined the class as those "who are or were employed to provide domestic services."  In response to the Court's order, Plaintiff selected the broadest of the three potential classes, despite the fact that Plaintiff is an HHA and all evidence presented relates to HHAs alone.  Therefore, Plaintiff's Motion should be denied.

> **B.**    **Even If Plaintiff's Proposed Class Were Limited To HHAs, Plaintiff Has Failed To Demonstrate That She And The Opt-In Plaintiffs Are  Similarly Situated To The Members Of The Proposed Class.**

Plaintiff has not met her burden of demonstrating that she is "similarly situated" either to the five opt-in plaintiffs who have filed consents to join this action or to the thousands of HHAs working in people's homes *nationwide*, let alone to the tens of thousands of In-Home Health Care Workers employed as skilled nurses, therapists, or medical social workers nationwide.  Here, Plaintiff has offered little more than conclusory, self-serving declarations to show that HHAs are similarly situated in terms of day-to-day job activities.[4]  These "cookie-cutter" declarations are nearly word-for-word identical with few facts.  *See* Mot. Exs. C-E.  For example, the named and opt-in Plaintiffs' declarations include a bare recitation of certain tasks but say absolutely nothing about the frequency or duration at which these tasks were performed, whether the tasks were related or unrelated to the personal care of their assigned patient or patients, or the manner in which these tasks were performed.  Therefore, they are not illustrative of whether HHAs *nationwide* are similarly situated.  Furthermore, the named and opt-ins' declarations all make the following legal conclusion:  "I am aware of other similarly situated Maxim employees who performed the same duties and were also not paid overtime."  *See id.*  Such conclusory, boilerplate legal conclusions

---

[4]  Plaintiff also relies on online job postings, but these postings do not constitute a common policy that warrants conditional certification.  *See infra* § IV(D)(2).

cannot be considered "evidence" by the Court as they are supported by no facts whatsoever.
*Armstrong v. Weichert Realtors*, No. 05-3120, 2006 WL 1455781, at *1-2 (D.N.J. May 19, 2006);
*Gonzales v. Hair Club for Men Ltd., Inc.*, No. 06-1762-Orl-28JGG, 2007 WL 1079291, at *2-3
(M.D. Fla. Apr. 9, 2007); *Songer v. Sillon Res., Inc.*, 569 F. Supp. 2d 703, 707-08 (N.D. Tex. 2008),
*aff'd*, 618 F.3d 467 (5th Cir. 2010).  Moreover, such conclusions cannot be afforded any weight
because, with rare exception, the HHAs work alone in patients' homes; they do not work with other
HHAs.  These declarants cannot testify about other HHAs' actions, because each one works in a
different home with a different patient.

Ultimately, Plaintiff provides no evidence, beyond her and the opt-ins' own speculative
beliefs, suggesting that all HHAs – let alone other In-Home Health Care Workers – nationwide are
required to work in the same manner.  *See Trinh v. JP Morgan Chase & Co.*, No. 07-1666, 2008
WL 1860161, at *4 (S.D. Cal. Apr. 22, 2008).  This gaping hole in Plaintiff's evidence alone is a
sufficient basis to deny conditional certification.  *See id.*  The overwhelming evidence reveals
significant variation in the types of duties that HHAs perform, the time devoted to those various
duties, and the manner in which they are performed.  *See* Exs. C-R.[5]  Such evidence is bolstered by
common sense and every day experience involving individuals requiring in-home health care.

> ### 1. Each Patient Has A Unique Plan Of Care And, Therefore, The HHA's Duties Vary From Patient To Patient.

The day-to-day activities of each HHA vary depending on the requirements set forth in each

---

[5] Declaration of Terry Benster ("Decl. Benster") is attached hereto as Exhibit C; Declaration of Reta Bodi ("Decl. Bodi") is attached hereto as Exhibit D; Declaration of Yvonne Christian ("Decl. Christian") is attached hereto as Exhibit E; Declaration of Diane Deubreau ("Decl. Deubreau") is attached hereto as Exhibit F; Declaration of Teresa Donnie-Jones ("Decl. Donnie-Jones") is attached hereto as Exhibit G; Declaration of Rachel Ford ("Decl. Ford") is attached hereto as Exhibit H; Declaration of Amy Frost ("Decl. Frost") is attached hereto as Exhibit I; Declaration of Kimberlee Hannum ("Decl. Hannum") is attached hereto as Exhibit J; Declaration of Albertina Johnson ("Decl. Johnson") is attached hereto as Exhibit K; Declaration of Kameelah Jones ("Decl. Jones") is attached hereto as Exhibit L; Declaration of Kenitha Kellom ("Decl. Kellom") is attached hereto as Exhibit M; Declaration of Roxanne Lemaster ("Decl. Lemaster") is attached hereto as Exhibit N; Declaration of Chelsea May ("Decl. May") is attached hereto as Exhibit O; Declaration of Dayra Nunez ("Decl. Nunez") is attached hereto as Exhibit P; Declaration of Michael Petrime ("Decl. Petrime") is attached hereto as Exhibit Q; Declaration of Haley Wright ("Decl. Wright") is attached hereto as Exhibit R.

patient's plan of care, which is based on the orders of the patient's medical provider who outlines the care that is to be provided based on the patient's specific medical needs.  Decl. Benster ¶ 5; Decl. Christian ¶ 5; Decl. Deubreau ¶ 9; Decl. Jones ¶ 5.  The plan of care is reviewed and updated at least every 60 days, and oftentimes more frequently.  Decl. Donnie-Jones ¶ 7; Decl. Deubreau ¶ 9.  In some instances, the HHA may make a suggestion to the patient's RN if the HHA observes something that the patient may need or would help in caring for the patient.  Decl. Donnie-Jones ¶ 7; Decl. Frost ¶ 6.  How often the plan of care is reviewed by the HHA also varies depending on the stability of the patient's condition and the familiarity the HHA has with the patient.[6]  In addition to the plan of care, HHAs may also review the "doctor's report" for updates on the patient's condition. Decl. Deubreau ¶ 9.  Changes to the plan of care impact the HHA's duties.[7]

HHAs are not permitted to deviate from the plan of care.  Decl. Bodi ¶ 12; Decl. Hannum ¶ 6.  For example, under Maxim's policies, HHAs are not permitted to perform services for non-patients.  Decl. Bodi ¶ 10; Decl. Donnie-Jones ¶ 16; Decl. Jones ¶¶ 15-16; Decl. Kellom ¶ 17; Decl. Lemaster ¶¶ 11-12.  If a patient or another person asks the HHA to perform duties outside the plan of care, the HHA is trained to refuse the request and notify Maxim, if necessary, because such a request would be an improper use of insurance and/or government funds and could lead to a program or insurer terminating its relationship with Maxim.[8]

---

[6] Decl. Benster ¶ 5 ("I normally review my patients' plan of care twice a week to ensure that I am aware of any changes."); Decl. Bodi ¶ 6 ("I usually review a plan of care each day or each week, depending on the patient."); Decl. Frost ¶ 6 ("every month for the twin boys I care for, and every 2 weeks for the sisters I care for); Decl. Jones ¶ 5 (review the plan of care on a "regular basis").

[7] Decl. Christian ¶ 6 ("[I]f a patient falls and is injured or has a seizure, the plan of care changes and the patient may be listed as high risk.  The duties I perform and the amount of time I spend on particular duties changes if a patient becomes high risk.  I need to monitor high risk patients even more closely and focus on preventing additional injuries."); Decl. Deubreau ¶ 10 (regular patient used to require oxygen, which required HHA to spend more time bathing patient and getting her dressed; after patient no longer required oxygen these activities took less time; when patient no longer required oxygen HHA began assisting patient on walks outside).

[8] Decl. Jones ¶ 15 ("As I tell all of my patients and their family members, 'I'm not your maid, I'm your aid!'"); *see also* Decl. Bodi ¶ 12; Decl. Christian ¶ 12; Decl. Deubreau ¶ 8; Decl. Donnie-Jones ¶ 16; Decl. Hannum ¶ 6; Decl. Kellom ¶ 17; Decl. Lemaster ¶¶ 11-12.

### 2. The Time Spent On Various Duties Performed By The HHAs Varies From Patient To Patient.

The types of duties and time devoted to a particular duty or the manner in which each HHA performs the duty all differ between patients and even between visits.  Decl. Benster ¶¶ 9-10; Decl. Bodi ¶¶ 9-13; Decl. Christian ¶¶ 9-10; Decl. Donnie-Jones ¶ 13-14; Decl. Frost ¶¶ 11-12; Decl. Hannum ¶¶ 11-15; Decl. Lemaster ¶¶ 7-10; Decl. May ¶ 8; Decl. Petrime ¶¶ 9-11.  For example, the health and condition of the patient impacts the manner and timing of an HHA's duties.[9]

Although the time that HHAs spend working directly with patients to provide care, maintenance, and fellowship varies, they consistently report spending at least 90% of their time performing care that is directly related to the patient.[10]  Due to emergencies, unforeseen events, and activities taking longer than expected, HHAs are not always able to complete all assigned tasks within the time period allotted.  Decl. Benster ¶ 7.  Patients may also accept or decline services and, therefore, each HHA's duties may vary from week to week based on an individual patient's desires.  Decl. Benster ¶ 7.  Some HHAs occasionally may work alongside another HHA when two or more patients live in the same dwelling, which also impacts the HHA's daily activities.  Decl. Frost ¶ 11.

---

[9] Decl. Donne-Jones ¶ 14 ("I had to completely bathe the elderly woman in her 90s, but only had to help the woman in her 80s get into the tub where she would take over cleaning herself.  Also, I had to travel more for the 80-year old patient to take her to doctor visits and pick up her medications from the pharmacy"); Decl. Jones ¶ 12 ("My female patients are more independent than my male patient because my male patient is unfortunately bed-ridden due to his crippling disease.  As such, I have to dress and bathe him completely each visit, whereas I need only help the elderly woman into the shower where she bathes herself, and I only sometimes help my stroke patient bathe and dress."); Decl. Christian ¶ 10 ("Caring for [bed bound patient] is very different than patients I have worked with who have Alzheimer's disease.  The Alzheimer's patients are generally very capable physically and can clean themselves and maintain their environment.  With these patients my focus is on providing them with positive social interactions and ensuring they do not leave the home and get lost or injured."); Decl. Frost ¶ 11 (teenage twin boys with down's syndrome required HHA to perform duties such as potty-training and "hand-over-hand" bathing and feeding, which HHA did not have to perform for her other patients); Decl. Petrime ¶¶ 10-11 (afternoon patient requires less direct assistance than morning patient because afternoon patient can move around more on his own, compared to morning patient that does not walk well on his own and has little control over his bodily functions).

[10] Decl. Bodi ¶¶ 9, 13 (90% with one of her patients and 90-95% with another patient); Decl. Deubreau ¶ 12 (90%); Decl. Donnie-Jones ¶ 13 (90%); Decl. Jones ¶ 11 (95%); Decl. Kellom ¶ 11 (98%); Decl. May ¶ 9 (over 90%).  This contrasts with Plaintiff, who alleges that she spent less than 80% of her time on these types of duties (among others that are not addressed in the declaration).  *See* Sec. Am. Compl. ¶ 15.

11

### 3. The Number Of Patients Assigned To An HHA May Dictate The Types Of Duties Performed, And How Often They Are Performed.

Each HHA employed by Maxim attends to a different number of patients, which can vary during the HHA's employment depending on the patients' needs, patients' schedule, HHA's availability, and HHA's experience.[11]  The number of patients assigned to an HHA also varies depending on whether the environment that the patient lives in is rural or urban, because rural locales often require more travel, and there may be fewer patients in close proximity.  Decl. Ford ¶ 12; Decl. Petrime ¶ 6.  Other HHAs care for more than one patient in a residence or care for more than one patient in a day.  Decl. Benster ¶ 8; Decl. Deubreau ¶ 5; Decl. Lemaster ¶ 5.

In addition to tending to their regular patients, HHAs may also fill in for other HHAs or pick up an additional shift when available.  Decl. Benster ¶ 12; Decl. Deubreau ¶ 5; Decl. Donnie-Jones ¶ 9; Decl. Hannum ¶ 3; Decl. Petrime ¶ 5.  If an HHA cares exclusively for a single patient, and that patient is totally dependent due to severe limitations, the HHA's duties may be more onerous.  Decl. Christian ¶ 10.  In contrast, if an HHA cares for numerous patients in a given week that are more independent and self-sufficient, the HHA's duties may be less onerous.  *See id*.  Thus, HHAs' job duties – specifically how much time is devoted to each particular task – can vary greatly.

### 4. The HHA's Duties Vary Depending On The Program Or Policy That Covers The Patient.

HHAs' duties differ from patient to patient depending on the state or federal program or insurance policy that provides for a patient's care (e.g., Medicaid, Passport Program, private insurance, Care Source, workers' compensation, and the Care Star Waiver Program).  Decl. Benster ¶ 4; Decl. Christian ¶ 4; Decl. Frost ¶ 4.  Each state or federal program or insurance provider maintains its own guidelines and restrictions regarding the nature of the care to be provided to

---

[11] Decl. Bodi ¶ 7 (4 patients); Decl. Christian ¶ 7 (currently 1 patient, but as many as 5 patients); Decl. Donnie-Jones ¶ 10-11 (currently 1 patient, but 2 before one passed away); Decl. Jones ¶ 7 (currently 3 patients, but 1 when she began employment with Maxim).

patients and the duties the HHA may perform for his or her patients.  Decl. Benster ¶ 4; Decl. Frost ¶ 4.  These programs and providers will fund only certain types of services, and those services vary from program to program and provider to provider.[12]  For example, Plaintiff provided HHA services to two of her grandparents under the Passport Program.  Decl. Markewicz ¶ 5.  However, under other programs, Plaintiff would have been prohibited from providing services to family members.  *Id.*  Guidelines and restrictions of the various programs and providers not only differ within a state, but also differ from state to state.  *Id.*  Therefore, each state has its own unique programs, policies, guidelines and restrictions that determine the HHAs' duties.  *Id.*

### 5. The HHAs' Schedules Vary And Impact The Type Of Work That They Perform.

HHAs' schedules vary depending on their personal availability and the needs of their patients.  Decl. Benster ¶ 12; Decl. Christian ¶ 7; Decl. Deubreau ¶ 5; Decl. Donnie-Jones ¶ 10; Decl. Hannum ¶¶ 3, 11; Decl. Petrime ¶ 5.  Consequently, the number of hours that each HHA works on a weekly basis also varies.[13]  Furthermore, some HHAs' schedules and hours can vary from week to week, especially if the HHA provides fill-in services for other HHAs.  Decl. Benster ¶ 12; Decl. Deaubreau ¶ 6; Decl. Donnie-Jones ¶ 9; Decl. Petrime ¶ 5.  This variation in schedules results not only in a change in hours, but also a change in duties.  *See supra* § IV(B)(4).

### 6. The Patient's Environment Also Impacts The Types Of Duties The HHAs Perform.

HHAs provide companionship services to patients in their homes; they do not work in a facility setting.  *See* Decl. Bodi ¶ 9; Decl. Christian ¶¶ 10-11.  Therefore, each HHA works in a different work environment, which impacts each HHA's day-to-day activities.  These various

---

[12] Decl. Benster ¶ 4 ("I cannot drive my Medicaid patients to the store to run errands, but I can run errands for them. Other programs allow HHAs to drive patients to run their own errands or accompany them to the store."); Decl. Frost ¶ 4 ("I worked in the homes of Maxim patients through the government [Care Star] Waiver program, which sets a cap on the hours and costs of service available.").

[13] Decl. Christian ¶ 7 (25 hours); Decl. Deubreau ¶ 6 (6 – 15 hours); Decl. Donnie-Jones ¶ 9 (20 – 58 hours); Decl. Ford ¶ 8 (10-12 hours); Decl. Hannum ¶ 3 (28-30 hours); Decl. Jones ¶ 8 (32 hours); Decl. May ¶ 4 (15-30 hours); Decl. Nunez ¶ 8 (27-30 hours); Decl. Petrime ¶ 7 (45 hours); Decl. Wright ¶ 6 (20 hours every other week).

13

factors include whether the patient lives in a house or an apartment; the size of the house or apartment; whether the house or apartment has more than one floor; whether the patient lives alone or with a family member or members; and whether the patient receives support from friends or family members outside the home.[14]

### 7.    The HHAs' Training Varies By Location.

Each Maxim office hires RNs to perform new-hire and annual training for HHAs.  Decl. Christian ¶ 3; Decl. Deubreau ¶ 3; Decl. Johnson ¶ 5; Decl. Kellom ¶ 3.  Some HHAs also participate in monthly training.  Decl. Christian ¶ 3; Decl. Hannum ¶ 4.  Each training session emphasizes different duties and results in different amounts of time being spent on different tasks depending on factors such as location, patient population and program or policy.[15]  While some HHAs are trained in a group, others are trained individually, and the training is tailored to meet the HHA's individualized training needs.  Decl. Ford ¶ 5.

As illustrated by the foregoing, the HHAs' daily activities vary greatly depending on a host of factors.  Ultimately, Plaintiff has not made even a modest factual showing that she is "similarly situated" to other HHAs, let alone all In-Home Health Care Workers that make up the alleged putative class.  Consequently, this Court should deny Plaintiff's Motion.

### C.    Evaluating The Applicability Of The Companionship Services Exemption To Each HHA Will Require Highly Individualized Determinations.

As detailed above, Plaintiff brings a misclassification claim, yet she nowhere alleges that all Maxim's In-Home Health Care Workers are classified as exempt under the companionship services

---

[14] Decl. Christian ¶ 11 ("With many patients I do not perform any homecare tasks.  Most of my patients live with other people that assist in taking care of them.  My current patient lives with her mother who maintains the house and helps with her physical therapy, feedings, bathing, and other needs."); Decl. Hannum ¶ 14 (HHA has to assist patient in going up and down stairs because patient lives in two-story house); Decl. Jones ¶ 6 ("I may not have to cook for a patient on a particular day if a family member brought him or her a meal."); Decl. May ¶ 10 (though HHA's 14-year old patient uses a wheelchair, "his parents usually pick him up and put him in the wheelchair for me").

[15] Decl. Hannum ¶ 4 (training "focused on critical care I provide to my patients with an emphasis on sanitation, bathing and first aid administration for universal precautions in the home"); Decl. Kellom ¶ 3 ("My trainers have stressed taking the time to provide a calming positive influence on patients . . . [Training] made clear that almost all of my time working should be spent providing direct care and comfort to patients.").

exemption, nor can she.  Indeed, Plaintiff has provided no evidence of any kind regarding Maxim's employees except for the HHA position.  Therefore, Plaintiff's Motion should be denied.

Even if Plaintiff was seeking to conditionally certify a class of HHAs nationwide, Plaintiff would fail because the evaluation of whether all HHAs nationwide are properly classified as exempt under the FLSA is inherently individualized and not subject to common proof.  The companionship services exemption states:

> [The overtime requirements of the FLSA] shall not apply with respect to . . . any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary [of Labor]).

29 U.S.C. § 213(a)(15).  Under U.S. Department of Labor regulations, the application of the companionship services exemption turns on the following:

> As used in section 13(a)(15) of the Act, the term companionship services shall mean those services which provide fellowship, care, and protection for a person who, because of advanced age or physical or mental infirmity, cannot care for his or her own needs.  Such services may include household work related to the care of the aged or infirm person such as meal preparation, bed making, washing of clothes, and other similar services.  They may also include the performance of general household work: Provided, however, that such work is incidental, i.e., does not exceed 20 percent of the total weekly hours worked.

29 C.F.R. § 552.6.

The primary issue is whether Maxim properly classified each HHA as exempt under the FLSA's companionship services exemption – an issue that must be determined by individualized analysis of whether each potential opt-in plaintiff performed general household work *unrelated to the care of the aged or infirmed person* more than 20% of the total hours worked in a given week.  *See* Sec. Am. Compl. ¶¶ 23-26.  As such, the question of whether HHAs are "similarly situated" requires analyzing whether common evidence can show the amount of time spent by HHAs on specific tasks.  *See Trinh*, 2008 WL 1860161, at *4 ("If the ultimate issue to be determined is whether each employee was properly classified as exempt under the FLSA, the 'similarly situated'

15

inquiry must be analyzed in terms of the nature of each putative plaintiff's job duties."  (citation omitted));  *Holt*, 333 F. Supp. 2d at 1272 ("'Similarly situated' inquiry in this case must be analyzed in terms of the nature of the job duties performed by each putative plaintiff, because the ultimate issue to be determined is whether each employee was properly classified as exempt.").

The focus of Plaintiff's claim (and that of each putative class member) is "the amount and extent of the general household work that [Plaintiff] performed."  Sec. Am. Compl. ¶ 21.  Per the DOL regulations, this necessarily requires an inquiry into whether the household work was "related to the care of the aged or infirm person" versus "general household work."  29 C.F.R. § 552.6.  Notably, neither Plaintiff's declaration nor those of the opt-ins address this issue.  These facts are central to determining whether the putative class members are similarly situated, yet the declarations are devoid of these central facts.

Further, Plaintiff fails even to identify the exemption at issue anywhere in her Motion, let alone discuss how common evidence can be used to satisfy its components.  Instead, Plaintiff devotes a scant portion of her Motion to discussing employment-related documents that she alleges pertain to all HHAs (not all *workers*).  *See* Mot. at 10-11.  Noticeably absent, however, is an explanation of how these few documents are material to determining whether each HHA is exempt as a result of the duties he or she performs on a daily basis, specifically what portion of his or her time is spent performing household work of one kind versus the other – the key issue in this case.

Instead, Plaintiff argues that any merit-based analysis of whether an FLSA exemption applies is not a proper subject at the conditional certification stage.  *See* Mot. at 9 n. 5; *see also id.* at 14.  Maxim, however, is not presently arguing the application of the exemption on the merits.  Rather, Maxim argues that the practical analysis involved in determining whether the companionship services exemption applies to employees who provide unique health-related services to patients in their own homes would involve an individualized fact-specific analysis of each

16

putative plaintiff's job.  Simply stated, it would be judicially inefficient to proceed on a collective basis given the highly-individualized inquiries necessitated by the exemption at issue.  *See Rutledge v. Claypool Elec., Inc.*, No. 12–0159, 2013 WL 435058, at *5 (S.D. Ohio Feb. 5, 2013) (denying conditional certification where "[t]here [was] no evidence that the Plaintiffs would present a single claim that if resolved for one, would be resolved for all"); *Bunyan v. Spectrum Brands, Inc.*, No. 07-0089, 2008 WL 2959932, at *9 n.5 (S.D. Ill. July 31, 2008) ("The court states no opinion as to whether plaintiffs are actually exempt employees under the FLSA.  Rather, the analysis here simply indicates that conditional certification would be inefficient because the court will have to undertake an analysis of each employee's work responsibilities in order to decide the issue."); *see also Trinh*, 2008 WL 1860161, at *5 (noting "[T]he Court is not opining whether Plaintiffs . . . have meritorious claims to overtime compensation; rather, the Court is examining the legal backdrop and type of evidence required to prove whether any employee is exempt or not.").

Plaintiff does not refute that the applicability of the companionship services exemption necessitates highly individualized determinations, but rather, argues that such facts should not be considered at the conditional certification stage.  *See* Mot. at 14.  To ignore these undisputable facts at this stage is folly.  Maxim should not be put to the burden of having notice sent to <u>potentially tens of thousands of employees nationwide</u> and engage in what likely would be years of discovery when it is obvious that the claim asserted by Plaintiff  cannot be adjudicated on a nationwide class basis.

None of the cases Plaintiff relies on to support her proposition are <u>exemption</u> cases – as is the case here.  Rather, the cases relied upon by Plaintiff are all off-the-clock cases, and therefore, distinguishable from the present case.  Contrary to Plaintiff's unsupported assertion, courts routinely deny conditional certification where individualized inquiry is necessary to determine employees' exempt status, <u>including cases dealing with the companionship services exemption</u>.  *See Johnson v. Bridges of Indiana, Inc.*, No. 10-153, 2010 U.S. Dist. LEXIS 103696, at *7-8 (S.D. Ind.

17

Sept. 28, 2010) ("Because an individualized inquiry into the work performed by each consumer associate during each week will be necessary to determine whether each was exempt from the FLSA [*under the companionship services exemption*], it does not appear to the Court that a class of consumer associates would be similarly situated to [plaintiff] (and to each other) with regard to the predominant issues in this case.   Therefore, the Court finds that certifying a collective action in this case is not appropriate."); *Severin v. Project OHR, Inc.*, No. 1:10-09696,  "Transcript of Record," at 6-7 (S.D.N.Y. Dec. 16, 2011), Dkt. No. 59 (finding that highly individualized determinations of *the companionship services exemption* precluded conditional certification), attached hereto as Ex. S; *Trinh*, 2008 WL 1860161, at *4 ("whether [potential opt-ins] are 'exempt' necessarily involves a fact-by-fact inquiry into the circumstances of each employee" and plaintiffs failed to show how common evidence could be used to prove each employee's exempt status).

In denying the plaintiff's motion for conditional certification under the FLSA, the court in *Severin* discussed the reasons why the individualized determinations of the *companionship services exemption* – the exemption at issue here – precluded conditional certification under the FLSA:

> I think it is premature to issue a collective action notice, and I am not sure that one will ever be appropriate in this case.  Under the FLSA, the companionship exemption will be a complete bar to liability.  The kinds of jobs that the companions hold are individualized.  They each have separate patients or clients; they have to tailor their duties -- indeed their hours -- everything to the needs of the individual client; they are working under general protocols and training and supervision that would, if anything, enforce the exemption and not permit a violation of the FLSA.
>
> So the plaintiff would have to establish on an individual plaintiff-by-plaintiff basis that somehow they performed general household work more than 20 percent of the time, and of course any work, household work, that is related to the fellowship, care or protection of their client wouldn't negate the exemption.  So there are so many fact-specific inquiries -- what kind of household work was performed; was it related to the fellowship, care and protection of the client; if it was not so directly related such that it would be considered general household work, did it constitute more than 20 percent of the time that the individual spent in that client's home or environment.
>
> So these are very fact-specific inquiries that aren't really susceptible, I think, to a similarly situated person analysis that would support the issuance of a collective action notice.

*Severin*, No. 1:10-09696, Dkt. No. 59, at 6-7.  The same conclusion should be compelled here for the same reason.

It is clear, even at this stage of the litigation, that an analysis of the companionship services exemption will depend exclusively on an employee-by-employee analysis of each HHA's daily and weekly job duties and circumstances, and that proceeding on a collective action basis will serve no legitimate purpose.  After all, the companionship services exemption is lost only for a week in which the HHA performs general household work duties unrelated to patient care more than 20% of the time.  *See* 29 C.F.R. § 552.6.  Therefore, an HHA conceivably could go in and out of the exemption from week to week.  *See supra* § IV(B).

This analysis of each HHA's job duties is going to yield an infinite variety of results as no two HHAs perform the same work, because no two patients are the same.  Quite simply, evaluating whether opt-in HHAs meet the companionship services exemption will require the Court to conduct the following individualized review and determinations, among others, as to each HHA:

- The nature of the activities performed, including whether any alleged household work performed was related to the fellowship, care and protection of the client.  29 C.F.R. § 552.6.  If not directly related such that it would constitute general household work, whether it constitutes more than 20% of the total weekly hours worked.  *See id.*

- The number and types of patients seen in a given week, which can vary from week to week.  *See supra* § IV(B)(3).  Because every plan of care is tailored to each patient's needs, an HHA performs different duties depending on each patient's specified needs.  *See supra* § IV(B)(1).  Therefore, whether the exemption applies would turn on, among other factors, the identities of the HHA's patients, the patients' needs, and the duties performed to meet those needs, which can change from week to week.  *See supra* § IV(B)(1), (3).

- The physical circumstances of the residence at which the caregiver provides services.  *See supra* § IV(B)(6).

- The program or provider that covers the patient.  *See supra* § IV(B)(4).

- Whether the HHA is performing tasks not contemplated by the plan of care and not reporting those tasks to the branch office in violation of Company policy and potentially in violation of Maxim's agreement with the applicable program or provider.  *See supra*

19

§ IV(B)(1).

Nothing in Plaintiff's Motion explains how these individualized determinations can be made through common proof.  Therefore, this case would not "partake of the economy of scale envisioned by the FLSA collective action procedure."  *Holt*, 333 F. Supp. 2d at 1275; *see also Bunyan*, 2008 WL 2959932, at *10.  As such, conditional certification should be denied.

**D.      Putative Class Members Are Not Similarly Situated As To A Uniform Illegal Policy.**

**1.      The Classification Of All HHAs As Exempt Does Not Constitute A Common Unlawful Policy That Warrants Conditional Certification.**

Plaintiff's failure to establish that she and the proposed putative class were "victims of a common policy or plan *that violated the law*" is fatal to her Motion.  *See Olivo*, 374 F. Supp. 2d at 548 (citations and quotations omitted; emphasis added); *see also O'Brien*, 575 F.3d at 585.  The purported common policy upon which Plaintiff relies is that Maxim "refus[ed] to pay overtime" and instead paid Plaintiff and other In-Home Health Care Workers straight time for all hours worked, even though she and other In-Home Health Care Workers worked more than forty hours per workweek.  *See* Mot. at 10.  Thus, while Plaintiff tries to dress up her claims as an attack on Maxim's policy of failing to pay HHAs overtime, in actuality, Plaintiff is challenging HHAs' classification as exempt employees.  There is nothing unlawful about an employer not paying overtime compensation to exempt employees.  29 U.S.C. § 213.  Accordingly, the classification of HHAs as exempt cannot alone be the glue that binds Plaintiff's FLSA class:

> First, *the employer's classification means little compared to the employee's actual job duties and circumstances…Merely being classified as exempt does not give rise to a right of action under 29 U.S.C. § 216(b).*  Such right under the FLSA only accrues once the employee is owed unpaid amounts.  29 U.S.C. § 216(b).  The Court believes that companies may indeed apply company-wide policies to their employees, *but these policies must <u>cause</u> the alleged FLSA violation for the policy to be considered as a factor in determining whether employees are "similarly situated" for purposes of bringing a collective action.*

*Oetinger v. First Residential Mortg. Network*, No. 60-381, 2009 WL 2162963, at *3 (W.D. Ky. July

20

16, 2009) (emphasis added); *see also Johnson*, 2010 U.S. Dist. LEXIS 103696, at *5 ("the relevant inquiry is not simply whether the proposed class members are paid overtime; rather, the relevant inquiry is whether the proposed class members are *denied* overtime *to which they are entitled under the FLSA*") (emphasis in original).

Simply stated, the challenged exemption, itself, cannot be the alleged "common policy or plan" that violates the law. If that were so, then this requirement of a common policy is no requirement at all, and every case alleging misclassification would be conditionally certified with nothing more than an allegation of misclassification. *See Colson v. Avnet, Inc.*, 687 F. Supp. 2d 914, 927 (D. Ariz. 2010) ("As a matter of both sound public policy and basic common sense, the mere classification of a group of employees – even a large or nationwide group – as exempt under the FLSA is not by itself sufficient to constitute the necessary evidence of a common policy, plan, or practice that renders all putative class members as 'similarly situated' for § 216(b) purposes."). Here, Plaintiff has failed to identify a single unlawful policy at Maxim, let alone one that applies to every one of its HHAs nationwide (or Workers nationwide), regardless of actual job duties, where and when those duties are performed, or level of compensation.[16] Ultimately, the classification of a group of employees as exempt does not alone support conditional certification.

### 2. Job Postings Do Not Constitute A Common Policy That Warrants Conditional Certification.

Likewise, the use of uniform job postings that list the scope of general job responsibilities for HHAs, does not render all In-Home Health Care Workers similarly situated, let alone HHAs, because job postings for the HHA position do not identify or dictate how HHAs actually spend their

---

[16] Courts also have repeatedly rejected Plaintiff's argument that an employer's classification of a group of employees as exempt is sufficient to warrant collective treatment. *See, e.g., Johnson,* 2010 U.S. Dist. LEXIS 103696, at *5 (uniform classification of consumer associates as exempt under the companionship services exemption was not enough to satisfy conditional certification); *Trinh*, 2008 WL 1860161, at *4 n.2 ("[M]erely alleging that a class of employees was wrongly designated 'exempt' does not constitute a showing of an unlawful institution-wide policy."); *Moore v. PNC Bank, N.A.*, No. 12-1135, "Memorandum Opinion and Order of Court," at 9-10 (W.D. Penn. May 29, 2013), Dkt. No. 45 (uniform classification of assistant branch managers was not sufficient to warrant conditional certification of nationwide class consisting of thousands of employees), attached hereto as Ex. T.

time, which is the central inquiry in this case.  *See Forney v. TTX Co.*, No. 05 C 6257, 2006 WL 1030194, at *3 (N.D. Ill. Apr. 17, 2006) (conditional certification denied; "[w]hether similarly situated employees exist depends on the employees' actual qualifications and day-to-day duties, rather than their job descriptions").  Here, Plaintiff provides no evidence that job postings control HHAs' actual daily activities.  The Motion simply cites a handful of on-line job postings for the HHA position alone – not job descriptions – and makes the unsupported conclusory assertion that these job postings somehow establish that Defendant employs all In–Home Health Care Workers in "identical capacities all across the country."  Mot. 10-11.  However, the job postings simply give a cursory two-sentence overview of the HHA position and some of its responsibilities (most of which, facially, appear to be exempt tasks), the available shifts, qualifications, available benefits, and general overview of the Company.  *See* Mot. Ex. H.  It cannot plausibly be argued that a cursory two-sentence overview of the HHA position and some of its responsibilities somehow establishes that all HHAs, *let alone all In-Home Health Care Workers nationwide*, are employed in "identical capacities."  These job postings hardly eliminate the need to resolve factual issues as to whether HHAs actually perform similar duties in similar ways at the same frequency.  *See Colson*, 687 F. Supp. 2d at 929 (allegations of similar job duties insufficient due to lack of evidence of common policy governing how employees spend their time); *Bunyan*, 2008 WL 2959932, at *7 ("job descriptions alone are insufficient to clear even the low evidentiary hurdle at this stage"); *Persin v. Career Builders, LLC*, No. 05 C 2347, 2005 U.S. Dist. LEXIS 23095, at *7-8 (N.D. Ill. Sept. 21, 2005) (conditional certification denied where plaintiff sought to certify based on common job title).  Because the job postings do not constitute proof of HHAs' actual daily activities and the amount of time spent performing such activities – the central issue in this case, they do not support a finding that all HHAs, (or all In-Home Health Care Workers) are similarly situated and, therefore, do not provide a basis for conditional certification.

22

## V.  PLAINTIFF'S PROPOSED FORM AND METHOD OF NOTICE IS INAPPROPRIATE

Finally, even if the Court were to overlook the facts and law and determine that conditional certification of the class somehow were appropriate, Defendant respectfully requests that the Court deny Plaintiff's request to utilize the biased Proposed Notice attached to her Motion, and direct the parties to meet and confer to devise a mutually acceptable and accurate notice.  *See Carlson v. Leprino Foods, Co.*, No. 05-798, 2006 WL 1851245, at *6 (W.D. Mich. June 30, 2006).  Following are a few of the most glaring flaws in Plaintiff's Proposed Notice:

- The Notice fails to state that the basis for Plaintiff's claims is the allegation that Maxim misclassified HHAs as exempt employees, and that such claim is premised on the amount of time spent performing general household work.  *See* Compl. ¶¶ 22-26.  As a result, the Notice implies that all HHAs were entitled to overtime.

- The Notice fails to include a statement informing potential plaintiffs that even if they choose to opt in to this case, their continued right to participate in the case may depend on a later decision by the Court that Plaintiff and the proposed putative class are or are not similarly situated.  As a result, the Notice fails to assist potential plaintiffs in making a fully informed decision on whether to join the case.  *See, e.g.*, *Shipes v. Amurcon Corp.*, No. 10-14943, 2012 WL 1720615 (E.D. Mich. May 16, 2012) (requiring language on possible decertification in Notice).

- The opt-in period should not exceed 30 days.  *See, e.g.*, *Snide v. Disc. Drug Mart, Inc.*, No. 11-0244, 2011 WL 5434016, at *8 (N.D. Ohio Oct. 7, 2011) (N.D. Ohio Nov. 8, 2011) (rejecting proposed notice with 60 day opt-in period based on efficiency concerns); *Baden-Winterwood v. Life Time Fitness*, No. 06-99, 2006 WL 2225825, at *3 (S.D. Ohio Aug. 2, 2006) ("sixty (60) days is too long and would needlessly delay the litigation"); *Beetler v. Trans-Foam, Inc.*, No. 11-132, 2011 WL 6130805, at *5 (N.D. Ohio Dec. 8, 2011) (rejecting a proposed 90-day opt-in period in order to prevent delay); *Burdine v. Covidien, Inc.*, No. 10-194, 2011 WL 2971186, at *1 (E.D. Tenn. July 21, 2011) (same).

- Plaintiff's proposal that notice be sent using *four* different methods – via U.S. mail, email, postings in branch offices, and inclusion in paychecks – is unduly intrusive and redundant.  *See, e.g.*, *Lindberg v. UHS of Lakeside, LLC*, 761 F. Supp. 2d 752, 765 (W.D. Tenn. 2011) ("In FLSA cases, first-class mail is generally considered to be the 'best notice practicable' to ensure that proper notice is received by potential class members"); *Mathews v. ALC Partner, Inc.*, No. 08-10636, 2009 WL 2591497, at *9 (E.D. Mich. Aug. 24, 2009) (directing notice by first-class mail only because other methods are "unnecessary and unduly intrusive").

If the Court were to order notice, Maxim respectfully requests that the Court direct the parties to submit a mutually agreeable notice within 30 days of the Court's Order.  If the parties cannot agree, they should submit their separate proposals for the Court's decision.  If the Court does

not order the parties to jointly submit a proposed notice, then Maxim respectfully requests the opportunity to address in more detail the inadequacies of the proposed notice and process.

## VI.  PROPOSED PUTATIVE CLASS MEMBERS' PERSONAL IDENTIFYING INFORMATION SHOULD NOT BE PROVIDED TO PLAINTIFF'S COUNSEL

If this Court were to conditionally certify a collective action and permit notice, it should also deny Plaintiff's attempt to invade employees' privacy by obtaining their email addresses or telephone numbers.  None of these absent putative class members' email information is necessary to provide notice of this action.  *See Vennett v. Am. Intercontinental Univ. Online*, No. 05-4889, 2006 WL 908030, at *3 (N.D. Ill. Apr. 5, 2006).  Similarly, telephone numbers should not be released. Direct telephone solicitation of potential plaintiffs is expressly prohibited by the Ohio Rules of Professional Conduct, and Plaintiff and her counsel have provided no legitimate explanation – nor could they – establishing the need for such information.  *See* Ohio R. of Prof'l Conduct 7.3; *see also Howard v. Securitas Sec. Servs., USA Inc.*, No. 08-2746, 2009 WL 140126, at *9 (N.D. Ill. Jan. 20, 2009) (denying plaintiffs' request for phone numbers on privacy grounds).  Likewise, providing email addresses for all putative collective action members is unwarranted not only due to privacy concerns, but because electronic notice can be altered, forwarded to other people, or otherwise egregiously abused.  *See, e.g.*, *Espenscheid v. DirectSat USA, LLC*, No. 09-625, 2010 WL 2330309, at *14 (W.D. Wis. June 7, 2010) (citations omitted).

## VII.  CONCLUSION

For the foregoing reasons, Defendant Maxim Healthcare Services, Inc. respectfully requests that the Court deny Plaintiff's Motion.  If the Court determines that it does not have sufficient evidence to make a reasoned decision on the issue of conditional certification at this time, Maxim suggests that the Court permit limited, expedited discovery relating to the opt-ins and declarants alone to further demonstrate that the individual nature of the HHAs' job duties renders it impossible to proceed with Plaintiff's claims on a class-wide basis.  If the Court were to grant conditional

24

certification and authorize notice, Defendant requests that the Proposed Notice as set forth herein be rejected, and that the Court order the parties to meet and confer concerning the notice to be issued.

Dated:  June 3, 2013                          Respectfully submitted,

                                              /s/ Katherine E. Kenny
                                              Thomas F. Hurka *(Admitted pro hac vice)*
                                              Katherine  E. Kenny *(Admitted pro hac vice)*
                                              Valerie E. Manos *(Admitted pro hac vice)*
                                              Mary Ellen Vales *(Admitted pro hac vice)*
                                              MORGAN, LEWIS & BOCKIUS LLP
                                              77 West Wacker Drive, 5th Floor
                                              Chicago, Illinois  60601

                                              David A. Campbell, III
                                              Liana R. Hollingsworth
                                              VORYS, SATER, SEYMOUR & PEASE
                                              2100 One Cleveland Center
                                              1375 East Ninth Street
                                              Cleveland, Ohio  44114

                                              *Attorneys for Defendant Maxim Healthcare Services, Inc.*

## **CERTIFICATE OF SERVICE**

I, Katherine E. Kenny, hereby certify that a true and correct copy of the above and foregoing

was served this 3rd day of June, 2013, via electronic filing, upon the following via the Court's

Electronic Filing System:

Jesse L. Young
Jason J. Thompson
Sommers Schwartz
2000 Town Center, Ste. 900
Southfield, MI  48075
248-355-0300
Fax: 248-746-4001

Timothy J. Becker
Jacob R. Rusch
Johnson Becker
33 South Sixth Street, Ste. 4530
Minneapolis, MN  55402
612-436-1800
Fax: 612-436-1801

Robert E. DeRose , II
Barkan Meizlish Handelman Goodin DeRose Wentz
250 East Broad Street, 10th Floor
Columbus, OH  43215
614-221-4221
Fax: 614-744-2300

David A. Campbell, III
Liana R. Hollingsworth
Vorys, Sater, Seymour & Pease - Cleveland
2100 One Cleveland Center
1375 East Ninth Street
Cleveland, OH  44114
216-479-6100
Fax:  216-479-6060

/s/ Katherine E. Kenny
Katherine E. Kenny