IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
CLEVELAND DIVISION

| | |
|---|---|
| JASMINE LAWRENCE, individually and on behalf of all similarly situated individuals,<br><br>　　　　　　Plaintiff,<br><br>　　　v.<br><br>MAXIM HEALTHCARE SERVICES, INC., a Maryland Corporation,<br><br>　　　　　　Defendant. | Case No. 1:12-cv-02600-CAB<br><br>Honorable Christopher A. Boyko |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT MAXIM HEALTHCARE SERVICES, INC.'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

**Page**

BRIEF STATEMENT OF THE ISSUES PRESENTED ............................................................ 1

SUMMARY OF ARGUMENT ............................................................................................... 1

I.      INTRODUCTION ......................................................................................................... 2

II.     MATERIAL FACTS AS TO WHICH MAXIM CONTENDS THERE ARE NO
        GENUINE ISSUES FOR TRIAL ................................................................................. 3

        A.      Maxim Healthcare Services, Inc .................................................................... 3

                1.      Documents Applicable to Home Health Aides ................................... 3

                        a.      Plans of Care and Home Health Aide Care Plans ................... 3

                        b.      Aide Weekly Notes ................................................................. 4

        B.      Lawrence's Employment with Maxim ............................................................ 5

                1.      Job Duties ........................................................................................... 5

                2.      Training Regarding Maxim's Documentation and Time Recording
                        Policies ............................................................................................... 6

                3.      Lawrence Provided Care to Two Patients .......................................... 7

                        a.      ██████████ ........................................................................ 8

                        b.      ██████████ ........................................................................ 9

                        c.      Lawrence's Alleged Work for Others Residing in the
                                ████████ Household ......................................................... 10

III.    ARGUMENT ............................................................................................................ 12

        A.      Summary Judgment Standard ...................................................................... 12

        B.      Lawrence Is Exempt From Overtime Compensation Under the FLSA Ohio
                Wage Act ..................................................................................................... 13

        C.      Lawrence Did Not Qualify for Either Exception to the Companionship
                Services Exemption ..................................................................................... 15

                1.      The "General Household Work" Provision Does Not Apply to
                        Lawrence ........................................................................................... 16

                        a.      There is No Dispute that More than 80 Percent of
                                Lawrence's Work for Mr. ████ and Ms. ██████ Was
                                Directly Related to Their Care ............................................. 17

                        b.      The Services Lawrence Performed for the ████████
                                Grandchildren and Other Household Tasks Unrelated to
                                Care Did Not Exceed 20% of Her Time ................................ 18

                2.      The "Trained Personnel" Exception Does Not Apply to Lawrence ........ 20

## TABLE OF CONTENTS
(continued)

**Page**

D.    Lawrence Cannot Sustain a Claim for "Off-the-Clock" Work ........................... 21

E.    Lawrence's Ohio Prompt Pay Act Claim is Dependent Upon and, Therefore, Falls with Her Overtime Claim ......................................................... 23

IV.    CONCLUSION ............................................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson v. City of Bessemer City*,
    470 U.S. 564 (1985)............................................................................................13

*Armani v. Maxim Healthcare Servs., Inc.*,
    53 F. Supp. 2d 1120 (D. Colo. 1999)......................................................14, 15, 17

*Baum v. Intertek Testing Servs.*,
    No. 13-1347, 2013 WL 6492372 (N.D. Ohio Dec. 10, 2013) ..............................24

*Brown v. ScriptPro, LLC*,
    700 F.3d 1222 (10th Cir. 2012) ...........................................................................22

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)............................................................................................12

*Cox v. Acme Health Servs., Inc.*,
    55 F.3d 1304 (7th Cir. 1995) ............................................................15, 18, 19, 20

*Ekokotu v. Fed. Express Corp.*,
    408 F. App'x 331 (11th Cir. 2011) ......................................................................23

*Forrester v. Roth's I.G.A. Foodliner, Inc.*,
    646 F.2d 413 (9th Cir. 1981) ...............................................................................22

*Handford v. Buy Rite Office Prods., Inc.*,
    3 N.E.3d 1245 (Oh. Ct. App. 2013).....................................................................12

*Johnston v. Volunteers of Am., Inc.*,
    213 F.3d 559 (10th Cir. 2000) .............................................................................14

*Kellar v. Summit Seating Inc.*,
    664 F.3d 169 (7th Cir. 2011) .........................................................................21, 23

*Lacy v. Reddy Elec. Co.*,
    No. 11- 52, 2013 WL 3580309 (S.D. Ohio July 11, 2013)..............................23, 24

*Lamur v. Sunnyside Cmty. Servs., Inc.*,
    No. 11- 4439, 2012 WL 3288770 (E.D.N.Y. Aug. 9, 2012) ................................16

*Lower v. Elec. Data Sys. Corp.*,
    494 F. Supp. 2d 770 (S.D. Ohio 2007) ................................................................24

*Lutz v. Huntington Bancshares Inc.*,
No. 12- 01091, 2014 WL 2890170 (S.D. Ohio June 25, 2014) ..............................................24

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)..............................................................................................................12

*McCune v. Or. Senior Servs. Div.*,
894 F.2d 1107 (9th Cir. 1990) ..................................................................................15, 16, 20

*Moore v. Philip Morris Companies, Inc.*,
8 F.3d 335 (6th Cir. 1993) .....................................................................................................12

*Myers v. Copper Cellar Corp.*,
192 F.3d 546 (6th Cir. 1999) .................................................................................................13

*Nelms v. Kramer*,
No. 10-627, 2012 WL 290306 (W.D. Tex. Jan. 31, 2012) ...............................................19, 20

*Raczkowski v. TC Const. Co.*,
No. 91-56536, 1993 WL 385483 (9th Cir. 1993) ...................................................................21

*Rodriguez v. Jones Boat Yard, Inc.*,
No. 09-23195, 2010 WL 7325250 (S.D. Fla. July 26, 2010) adopted by, No.
09-23195, 2010 WL 7325249 (S.D. Fla. Oct. 25, 2010) aff'd, 435 F. App'x
885 (11th Cir. 2011)...............................................................................................................19

*Salyer v. Ohio Bureau of Workers' Comp.*,
83 F.3d 784 (6th Cir. 1996) .............................................................................................14, 18

*Schremp v. Langlade Cty.*,
No. 11-590, 2012 WL 3113177 (E.D. Wis. July 31, 2012) ....................................................22

*Terwilliger v. Home of Hope, Inc.*,
42 F. Supp. 2d 1231 (N.D. Okla. 1999)..................................................................................17

*Torres v. Ridgewood Bushwick Senior Citizens Homecare Council Inc.*,
No. 08- 3678, 2009 WL 1086935 (E.D.N.Y. Apr. 22, 2009) ..................................................16

*Toth v. Green River Reg'l Mental Health/Mental Retardation Bd., Inc.*,
753 F. Supp. 216 (W.D. Ky. 1989)..........................................................................................16

*White v. Baptist Mem'l Health Care Corp.*,
699 F.3d 869 (6th Cir. 2012) .................................................................................................21

*Wood v. Mid-Am. Mgmt. Corp.*,
192 F. App'x 378 (6th Cir. 2006) ...........................................................................................23

**STATUTES**

29 U.S.C. §203(g) ........................................................................................................21

29 U.S.C. §§ 206, 207, 215 ..........................................................................................21

29 U.S.C. § 213(a)(15).....................................................................................1, 13, 14, 21

FLSA .............................................................................................................................21

Ohio Rev. Code § 4111.02.............................................................................................21

Ohio Rev. Code § 4111.03.............................................................................................21

**RULES**

Fed. R. Civ. P. 56(c) ....................................................................................................12

**REGULATIONS**

29 C.F.R. § 552.6 ............................................................................................... passim

29 C.F.R. § 552.109(a)..................................................................................................14

29 C.F.R. §785.11 ..........................................................................................................21

**OTHER AUTHORITIES**

Opinion Letter, Stephen E. Zweig, Department of Labor (Mar. 16, 1995), 1995
WL 1032475 ...........................................................................................................16

## BRIEF STATEMENT OF THE ISSUES PRESENTED

Whether Maxim Healthcare Services, Inc. ("Maxim") is entitled to summary judgment on Lawrence's claims for overtime compensation under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA") and the Ohio Minimum Fair Wage Standards Act, O.R.C. § 4111.01, *et seq.* ("Ohio Wage Act"), where Maxim classified Lawrence as exempt under the FLSA's exemption for companionship services, 29 U.S.C. § 213(a)(15), under then-current Department of Labor regulations (*see* 29 C.F.R. § 552.6), because Lawrence met the qualifications for the exemption and, specifically, did not perform general household work that was both unrelated to her assigned patients and in excess of twenty percent of her total hours worked in a given week.

Whether Maxim is entitled to summary judgment on Lawrence's claim under the Ohio Prompt Pay Act, O.R.C. § 4113.15, where Lawrence acknowledges that she received her paychecks on a timely basis and those paychecks reflected pay for all work hours that she recorded, and she has failed to establish that she is entitled to additional wages in the form of overtime pay under the FLSA and Ohio Wage Act.

## SUMMARY OF ARGUMENT

Maxim is entitled to summary judgment on Lawrence's overtime claims. First, while employed by Maxim as a certified Home Health Aide ("HHA"), Lawrence qualified for the companionship services exemption from the overtime and minimum wage provisions of the FLSA, 29 U.S.C. § 213(a)(15). Lawrence's employment as an HHA, providing basic health and household services to patients in their private homes, exempts her from payment of overtime compensation during her employment with Maxim under the companionship services exemption. Second, Lawrence does not qualify for an exception to the companionship services exemption: she neither spent more than 20% of her time performing general household services, nor did she

-1-

provide care performed by trained personnel such as a registered or practical nurse.  For these reasons, Lawrence's employment with Maxim falls squarely within the companionship services exemption, thereby exempting her from overtime compensation under the FLSA and the Ohio Wage Act.

Maxim also is entitled to summary judgment on Lawrence's Prompt Pay Act claim. Lawrence does not contest the timing of the paychecks she received; rather, she asserts that the paychecks she did receive did not contain overtime wages for hours worked over 40.  Because there is no independent right to wages under the Ohio Prompt Pay Act and Lawrence has failed to establish an entitlement to overtime wages under the FLSA and the Ohio Wage Act, her Prompt Pay Act claim fails as a matter of law.

## I.    INTRODUCTION

This is a straightforward matter.  The undisputed facts show that Lawrence qualified for the companionship services exemption under the FLSA while employed by Maxim as an HHA. By her own admission, Lawrence regularly spent her time performing care-related services for the patients she serviced on behalf of Maxim.  The records shows that Lawrence spent more than 80 percent of her time providing services directly related to her patients' care.  Lawrence cannot now contend that she spent more than 20 percent of her time performing general household services or services for individuals other than her patients, when the undisputed facts prove otherwise.

Maxim likewise is entitled to summary judgment on Lawrence's claim under the Ohio Prompt Pay Act.  Lawrence does not contest the *timing* of the paychecks she received (and, in fact, acknowledges that she promptly received payment for all of the hours she recorded). Rather, her Prompt Pay Act claim is predicated on Maxim's alleged failure to pay her overtime

under the FLSA and Ohio Wage Act.  Because her overtime claims fail as a matter of law, her Ohio Prompt Pay Act claim must fail.

In sum, for the reasons set forth below, Maxim is entitled to summary judgment on Lawrence's claims.

## II.    MATERIAL FACTS AS TO WHICH MAXIM CONTENDS THERE ARE NO GENUINE ISSUES FOR TRIAL

### A.    Maxim Healthcare Services, Inc.

Maxim is a provider of home health care, medical staffing and wellness services for children, adults and senior citizens living with chronic conditions, recovering from illness or in need of daily assistance. Ex. A at ¶ 2.[1]  Maxim provides these services to its clients through the in-home placement of trained healthcare workers to provide care to enable patients to achieve the highest degree of recovery, comfort and independence.  *Id*.  Maxim's professionals, including its HHAs, work in patients' private homes to provide individualized personal care and work closely with assigned physicians, nurses, and family members to implement the best plan of care for each patient.  *Id*.  Lawrence was classified as exempt from the overtime requirements of the FLSA and Ohio Wage Act during her entire term of employment with Maxim.  Ex. A, at ¶ 12l Ex. B at 30-31.

#### 1.    Documents Applicable to Home Health Aides

##### a.    *Plans of Care and Home Health Aide Care Plans*

Maxim identifies the needs of each patient based on the requirements set forth in his or her plan of care, which is based on the orders of the patient's treating physician or supervising medical provider who outlines all of the care that is to be provided to the patient based on the

---

[1] Citations to the record shall appear as follows: Declaration of Scott Thompson, dated October 28, 2015 (Ex. A); Deposition of Scott Thompson, taken July 30, 2015 (Ex. B); Deposition of Amanda Mottayaw, taken July 30, 2015 (Ex. C); Deposition of Diana Flannigan, taken September 25, 2015 (Ex. D); Deposition of Holly Summers, taken September 25, 2015 (Ex. E); Deposition of Michael Schweninger, taken August 25, 2015 (Ex. F); Deposition of Jessica Carr, taken August 25, 2015 (Ex. G); Deposition of Jasmine Lawrence, taken May 28, 2015 (Ex. H).

patient's specific medical needs.  Ex. A at ¶ 3; Ex. C at 76; Ex. D at 67-68; Ex. E at 61.  Each patient has his or her own unique plan of care that is customized to the patient's medical condition, abilities and needs.  Ex. A at ¶ 4.  Maxim reviews the plan of care and, for any home health aide services identified, creates a home health aide care plan which specifies the different types of duties that an HHA must perform to properly care for the patient pursuant to the applicable program.  Ex. C at 76; Ex. E at 61-63.  The plan of care and home health aide care plan are reviewed and updated by a registered nurse ("RN") employed by Maxim and sometimes a case manager employed by the provider, at least every sixty (60) days.  Ex. A at ¶ 5; Ex. C at 44; Ex. E at 38.  This sometimes also is referred to as "recertification."  Ex. C at 44; Ex. E at 38.

An HHA is required to regularly review and comply with the home health aide care plan.  Ex. A at ¶ 6.  Because each provider details the services that it will fund, Maxim has a strictly enforced policy that HHAs are not permitted to deviate from the plan of care.  Ex. A at ¶ 7; Ex. F at 66.  HHAs are responsible for following the plan of care specific to each patient and are trained not to deviate from the plan of care.  Ex. C at 53, 67; Ex. D at 40.  If a plan of care does not prescribe a specific duty, then the HHA is not authorized to perform that duty, even if requested by the patient.  Ex. D at 62-63.  HHAs are trained that, if asked to perform a task not detailed in the plan of care, such as performing household services for a non-patient, they must refuse the request and notify Maxim's branch office.  Ex. B at 161; Ex. C at 56-57; Ex. E at 57-58.

### b. *Aide Weekly Notes*

HHAs fill out daily paperwork in the form of an aide weekly note for each patient, wherein the HHA identifies the duties performed in caring for the patient, as well as the date, patient medical record number, the HHA's time in, time out, the total hours worked each day, and the patient's and employee's signatures.  Ex. A at ¶ 8; Ex. B at 74.  The daily paperwork

allows Maxim to compensate HHAs for the hours worked, verify that the work has been performed to the patient's satisfaction, and bill the applicable program or provider for the HHA's services.  Ex. A at ¶ 9; Ex. B at 98.  To complete the weekly note, the HHA indicates, by checking a box corresponding to the care provided, the duties performed during each shift.  Ex. G at 40; Ex. D at 38.  Further, the weekly note includes a narrative section for the HHA to provide additional comments about any care provided or refused, or any care provided beyond the scope of the plan of care.  Ex. H at 98-101; Ex. H-14; Ex. C at 34-35, 57; Ex. B at 75-76, 121-122.  At the end of the week, the HHA must submit the form to Maxim.  Ex. H at 48-49; Ex. D at 33; Ex. A at ¶ 15; Ex. A-2.  It is the HHA's responsibility to make sure that the duties performed correspond to the plan of care.  Ex. F at 56.

### B.      Lawrence's Employment with Maxim

Lawrence began working for Maxim as a certified Home Health Aide on May 27, 2011.  Ex. H at 19-20; Ex. A at ¶ 11.  She was affiliated with Maxim's Mansfield, Ohio office.  Ex. A at ¶ 10; Ex. B at 62-63.  Lawrence provided notice of her resignation on or about September 24, 2012, after finding a position as a Home Health Aide with another company.  Ex. A at ¶ 11; Ex. H at 12, 20.  During her employment with Maxim, Lawrence was never licensed, trained or certified as an RN or licensed practical nurse ("LPN").  Ex. A at ¶ 13.

### 1.      Job Duties

While at Maxim, Lawrence worked under the direct supervision of an RN employed by Maxim, also known as a Clinical Supervisor, to provide assistance and personal care to individual patients, each in his or her private residence, in accordance with the orders of the patient's physician and the plan of care.  Ex. A at ¶ 14; Ex. D at 13.  At the inception of her employment, Lawrence was provided with a job description that described her duties as a Home Health Aide, including the following:

- Assisting home-care patients with baths, back rubs, oral hygiene, shampoos, skin care, shaving, dressing and undressing, and toileting activities;
- Changing bed linen;
- Keeping patient's living area clean and orderly;
- Positioning/turning patients;
- Assisting with ambulation and exercise according to the plan of care;
- Assisting patient with range of motion and other simple procedures;
- Assisting patient with meal preparation, feeding, and self-administration of medication;
- Doing patient's laundry, as appropriate;
- Recording the patient's vital statistics when ordered;
- Reporting on patient's condition and significant changes to the assigned nurse; and
- Adhering to Maxim's documentation and care procedures and standards of personal and professional conduct.

Ex. H at 26-27, 59-60; Exs. H-3, H-9.  Lawrence testified that she performed all the job duties listed on the job description, with the exception of taking patients' temperatures and assisting with ambulation and exercise.  Ex. H at 27-28.  Lawrence testified, however, that she also assisted her patients with getting into and out of chairs and going to the toilet.  *Id.*

## 2.    Training Regarding Maxim's Documentation and Time Recording Policies.

Prior to beginning patient assignments, Lawrence participated in training, including watching videos related to HHA duties and also participating in hands-on training.  Ex. H at 21-22, 32; Ex. A at ¶ 15.  The training included attendance at Maxim's clinical orientation training program, where HHAs receive instruction on 42 topics, including the home health aide care plan.  Ex. H at 32-33; Ex. A at ¶ 15.  Maxim's records show that Lawrence received additional training shortly thereafter and throughout her employment with Maxim covering a variety of topics, including compliance training.  Ex. A at ¶ 16; Ex. A-3.  In addition, Maxim's records show that Lawrence received and acknowledged the Ohio Medicaid/ODJFS/ODA Waiver Provider Code of Ethics Training, which specifically included "providing care to individuals other than the consumer" among those activities that are prohibited by Maxim.  Ex. A at ¶ 17; Ex. A-4.

Lawrence further testified that she complied with training from the clinical orientation program that "all documentation shall be completed as care is provided no later than the end of the shift or visit" and prohibiting pre-filling or post-filling of any forms documenting the work performed.  Ex. H at 48-50, 52-53; Ex. A at ¶ 15; Ex. A-2.  The clinical training further instructed, "AVOID THESE BEHAVIORS . . . Do not provide care or supervision for anyone other than the patient assigned;" "Do not provide services that are not on the plan of care;" "Contact the physician if you need care that is not listed;" and "Follow the aide care plan."  Ex. H at 33-34; 36; Ex. A at ¶ 15; Ex. A-1; Ex. C at 89.

Finally, Lawrence testified that she received and followed instructions on how to complete the aide weekly notes.  Ex. H at 55-56; Ex. D at 135-36; Ex. D-12.  She testified that she never falsified any documentation with respect to her working hours, never identified any errors in her paychecks, and never complained to Maxim regarding any errors in her paychecks.  Ex. H at 31, 158-159.  Lawrence always received her paychecks on a timely basis.  *Id.* at 180.  During her deposition, Lawrence alleged that for a period of time, she did not accurately record her hours if she stayed over her shift by a few minutes because she was told by someone at Maxim not to record time outside her scheduled shift.  *Id.* at 173-174.  However, when shown her pay records for various pay periods, Lawrence acknowledged that she accurately recorded her time to the minute and was paid for all of the time that she recorded.  *Id.* at 175-181; Exs. H-13, H-16.

### 3.      Lawrence Provided Care to Two Patients

Lawrence provided care to two patients over her approximately one and one half (1 ½) years of employment with Maxim: █████████ from May 2011 to September 2012, and █████████████, who resided in the same home, also from May 2011 to September 2012.  Ex. A at ¶ 18.

a.  ▮▮▮▮▮▮▮▮

Lawrence provided care to Mr. ▮▮▮▮, a 69-year old male diagnosed with chronic renal failure, Chronic Obstructive Pulmonary Disease, hypertension, cataracts, and CAD.  Ex. H at 80-81; Ex. H-11.  Lawrence provided care to Mr. ▮▮▮▮ on Tuesdays, Thursdays and Saturdays, for two hours per day.  Ex. H at 66-67; Ex. H-11.  Per the plan of care and home health aide care plan, Mr. ▮▮▮▮ was independent with respect to personal care and, therefore, the plan of care instructed personnel to provide housekeeping services as needed each shift, and to prepare and serve meals.  Ex. H at 68, 72; Ex. H-11; Ex. D at 69-71, 75-76; Ex. D-4.  The home health aide care plan identified the "top goals" as "maintain clean and safe environment free from clutter."  Ex. H at 88-89; Ex. H-12.

Lawrence testified that she performed the following services for Mr. ▮▮▮▮ *during each two-hour shift*: (a) prepared breakfast; (b) cleaned the kitchen after cooking, including washing dishes, cleaning out the refrigerator as needed, wiping down the stove and countertops, occasionally cleaning the oven, and taking out the trash (typically 15 minutes, but up to 30 depending on the volume of dishes); (c) cleaned Mr. ▮▮▮▮ bedroom, which included picking up shoes and clothes left on the floor and putting clothes into the laundry basket, vacuuming the room, and changing his bed linens (5-10 minutes); (d) picked things up and cleared walkways; (e) did Mr. ▮▮▮▮ laundry; and (f) occasionally cleaned the bathroom. Ex. H at 68-73, 82, 118, 120-121.

Lawrence testified that she only provided care to Mr. ▮▮▮▮ inside the home.  Ex. H at 78.  Once per month, she would "run down to the church down the street and sometimes make a plate of food or something if they had [] a pot luck there."  *Id.* at  79.

**b.** ████████████████

Lawrence testified that Ms. ██████ had limitations on walking and caring for herself, and that she needed assistance taking showers or baths, using the restroom, generally getting up to move from room to room, getting cleaned up, and changing clothing to get ready for bed. Ex. H at 102-103. Ms. ██████ also soiled herself often and needed assistance changing her clothes and cleaning up. *Id.* at 103. Lawrence provided care to Ms. ██████ for approximately ten hours per day, seven days a week, from 10:00 pm to 8:00 am. *Id.* at 104, 147-148. Lawrence testified that Ms. ██████ "didn't really sleep." *Id.* at 135. Instead, she "was up and down all night," and needed Lawrence's assistance. *Id.* The plan of care and home health aide care plan for Ms. ██████ also instructed personnel to provide housekeeping services as needed per shift and also ensure that the home was safe for the patient. Ex. D at 80-81; Ex. D-4. Diana Flannigan, a former RN Supervisor who supervised Lawrence, explained that this includes ensuring Ms. ██████ assistance device is working appropriately, that there are no loose rugs or anything on the floor, and that there is ample room for Ms. ██████ to ambulate in the home without tripping or falling. *Id.*

Lawrence testified that the services she provided to Ms. ██████ *on a daily basis* included: (a) assisting her with personal care, including bathing (30 minutes), hair care (5 minutes), skincare (5-10 minutes), dressing and undressing (1 hour, but possibly more if Ms. ██████ soiled herself more than once); (b) assisting Ms. ██████ to move between the living room, bathroom (approximately 10-15 times per day) and kitchen (a total of 3-4 hours or more); (c) helping Ms. ██████ get into and out of bed (5-10 minutes); (d) one to two loads of laundry, occasionally three (1 to 2 hours); (e) cleaning Ms. ██████ bedroom (5-10 minutes); (f) cleaning the bathroom that Ms. ██████ used, typically once per day but sometimes twice (5-10 minutes); (g) preparing dinner for Ms. ██████ (10-20 minutes, possibly more); (h) making

snacks for Ms. ██████ (a "few" minutes); (i) clearing walkways to ensure that Ms. ██████ did not trip or fall; (j) vacuum, sweep and mop the living room, the kitchen, Ms. ██████ and Mr. ██████ separate bedrooms, and the two bathrooms that they used (10-15 minutes); and (k) watch TV and talk with Ms. ██████ (2-3 hours).  Ex. H at 105, 110-112, 114, 116-118, 122, 135-137.

Lawrence testified that she emptied the trash cans inside the house and took the trash outside approximately every two days or as needed, which just took a few minutes to complete. Ex. H at 124-125.  She also testified that she cleaned the oven "[a]pproximately every two weeks, as needed" (5-10 minutes), dusted every three days (15 minutes), dusted the blinds every two weeks or as needed, and cleaned the front door window and screen when Ms. ██████ asked her and if she had extra time.  *Id.* at 106, 151-152, 164-165.

Lawrence testified that she only provided care to Ms. ██████ inside the home.  *Id.* at 78.

### c.    *Lawrence's Alleged Work for Others Residing in the* ██████ *Household.*

Lawrence testified that she performed duties for the ██████ 21- or 22-year old grandson, ██████, who lived in their home, as well as approximately eight other grandchildren ranging in age from 12 to 16, who visited the home at varying intervals each week.  Ex. H at 41-43, 191.  Lawrence testified that she believes ██████ has a mental illness, but is able to take care of himself and primarily stayed in his bedroom when Lawrence was at the ██████ home.  *Id.* at 201-202.  Ms. ██████ daughter, ██████, also lived in the home, but Lawrence testified that she typically was not in the house when Lawrence was there, and when ██ was in the house, she was asleep in her bedroom.  *Id.* at 47.  Lawrence testified that ██ (13 or 14 years old) and ██ (14 or 15 years old) visited the ██████ home approximately every other

day, but sometimes more frequently, and they sometimes slept overnight at the home.  *Id.* at 38-39.  ███████ (15 or 16 years old) and her sister ██████ (approximately 15 years old) visited the home once per week and typically spent the night.  *Id.* at 39-40.  Lawrence testified that two other grandchildren, ages 12 or 13, visited the home every other day and stayed overnight twice per week.  *Id.* at 42.  Additionally, Lawrence testified that Ms. ████████ son, ██████, visited the home twice per week for approximately one hour.  *Id.* at 40-41.

When Lawrence made breakfast for Mr. ████████, she did so family-style because Ms. ████████ typically dined with him.  Ex. H at 75.  Breakfast typically consisted of eggs, bacon, sausage, or liver.  *Id.* at 74.  If there were grandchildren at the house, Lawrence sometimes made more food so that they could share.  *Id.* at 75-76.  Lawrence testified that on average, there were three people at breakfast when she made a meal for Mr. ████████.  *Id.* at 76.

The types of meals Lawrence made for Ms. ████████ included salad and baked chicken, bacon, eggs and grits. Ex. H at 131.  Lawrence testified that the ████████ typically had dinner together and one or two grandchildren ate with them every two days.  *Id.* at 132.  On those occasions, Lawrence made bigger meals, such as spaghetti, meatloaf and potatoes, or chicken with rice, so there was enough food for everyone.  *Id.* at 132-133.  Doing the dishes took longer on those days because there were more than one or two place settings.  *Id.* at 132.

Lawrence testified that the other services she provided in relation to the grandchildren included: (a) moving shoes and clothes aside that were in the walkways or areas of the house used by Mr. ████████ and Ms. ████████; (b) if they left food or trash out, she put it in the kitchen or threw it out; (c) cleaning up juice spills; and (d) "watching them and make sure that they don't have nothing out in the way."  Ex. H at 45-46.  Additionally, when Lawrence did laundry for

Ms. ████, she sometimes also did laundry for Mr. ████ and ████ at the same time, because their clothes "were all in the same bin."  *Id.* at 117; 188-189.

Lawrence did not report to anyone at Maxim that she was providing care or supervision to people over than her patients.  Ex. H at 46-47.

## III.    ARGUMENT

### A.    Summary Judgment Standard

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, admissions, together with affidavits, "show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In this context, a defendant is only required to show that there is no evidence to support the plaintiff's claims.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  While the facts and all reasonable inferences drawn from the facts are to be viewed in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), it is the plaintiff who bears the burden of going outside of the pleadings and presenting admissible evidence demonstrating that facts exist that raise genuine issues of fact that should be reserved for trial. *Celotex*, 477 U.S. at 324.  The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts."  *Moore v. Philip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).

The sole issue here is whether Maxim properly classified Lawrence as exempt under the FLSA's companionship services exemption[2] – an issue that must be determined by individualized analysis of whether she performed ***general household work unrelated to the care***

---

[2] Because the Ohio Wage Act's overtime requirements are identical to those contained in the FLSA, courts "look to cases interpreting the FLSA in guiding [their] interpretation of R.C. 4111.03."  *Handford v. Buy Rite Office Prods., Inc.*, 3 N.E.3d 1245, 1250, FN 2 (Oh. Ct. App. 2013).

*of the aged or infirmed person more than 20% of the total hours worked in a given week*.[3] This analysis must take place within the context of Lawrence's actual job duties, with the focus on the amount and extent of general household work unrelated to patient care that Lawrence performed each week. Per Department of Labor regulations, this necessarily requires an inquiry into whether the household work was "related to the care of the aged or infirm person" versus "general household work." 29 C.F.R. § 552.6. As set forth below, Maxim is entitled to summary judgment because the record in this case shows that because Lawrence did not perform general household work that was both (a) unrelated to her assigned patients' care and (b) in excess of twenty percent (20%) of her total hours worked in a given week, there are no genuine issues of fact or theories of law which support her claim to overtime compensation. Moreover, because Lawrence's overtime claims fail, her claim under the Ohio Prompt Pay Act fails as a matter of law.

**B. Lawrence Is Exempt From Overtime Compensation Under the FLSA Ohio Wage Act.**

In an action to recover unpaid overtime compensation under the FLSA, a plaintiff must prove by a preponderance of the evidence that she performed work for which she was not properly compensated. *See Myers v. Copper Cellar Corp.*, 192 F.3d 546, 551 (6th Cir. 1999) (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)). Lawrence cannot establish a claim for overtime compensation under the FLSA because the undisputed facts show that, while employed by Maxim as an HHA, she qualified for the companionship services exemption from the overtime and minimum wage provisions of the FLSA, 29 U.S.C. § 213(a)(15).

Specifically, the companionship exemption applies to "any employee employed in

---

[3] Maxim does not dispute that on occasions when Lawrence worked more than forty hours per week she did not receive overtime compensation. Rather, Maxim's sole contention is that Lawrence's services are exempt from FLSA coverage.

domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are delimited by regulations of the Secretary [of Labor])." *Salyer v. Ohio Bureau of Workers' Comp.*, 83 F.3d 784, 787 (6th Cir. 1996) (quoting 29 U.S.C. § 213(a)(15)). Persons qualifying for the companionship services exemption are expressly excluded from the minimum wage and overtime provisions of the FLSA, 29 U.S.C. § 207.  *Id.* at 787.

The regulation promulgated pursuant to § 213(a)(15) defined companionship services as:

> ... those services which provide fellowship, care, and protection for a person who, because of advanced age or physical or mental infirmity, cannot care for his or her own needs. Such services may include household work related to the care of the aged or infirm person such as meal preparation, bed making, washing of clothes, and other similar services. They may also include the performance of general household work: Provided, however, That such work is incidental, i.e., does not exceed 20 percent of the total weekly hours worked. The term "companionship services" does not include services relating to the care and protection of the aged or infirm which require and are performed by trained personnel, such as a registered or practical nurse. While such trained personnel do not qualify as companions, this fact does not remove them from the category of covered domestic service employees when employed in or about a private household.

29 C.F.R. § 552.6 (2014).[4]

Employees providing companionship services need not be employed directly by the person receiving the services or by that person's family for the exemption to apply; it applies to individuals employed by a service agency, such as Maxim.  *See Johnston v. Volunteers of Am., Inc.*, 213 F.3d 559, 562 (10th Cir. 2000); *Armani v. Maxim Healthcare Servs., Inc.*, 53 F. Supp. 2d 1120, 1126-27 (D. Colo. 1999); 29 C.F.R. § 552.109(a); Ex. I, DOL Op. 2005-13.

Lawrence admitted that she regularly and customarily spent her time performing the

---

[4] The Department of Labor reversed its position on this issue and issued a Final Rule on October 1, 2013, which originally was scheduled to go into effect on January 1, 2015.  The new regulation post-dates Lawrence's employment with Maxim and, therefore, is inapplicable here.

following care-related services for the patients she serviced on behalf of Maxim: bathed them, prepared meals for them, provided cleaning services related to their care, changed their bedding, and washed their clothes.  In fact, with the exception of cleaning windows at Ms. ██████ request and some tasks performed for grandchildren while at the ██████ home, there were no tasks Lawrence performed during her home-care visits that did not originate from or directly relate to caring for her infirmed patients.

Courts repeatedly have held that the companionship services exemption is properly applied to employees, who like Lawrence, provide home health care services.  *See Cox v. Acme Health Servs., Inc.*, 55 F.3d 1304, 1310 (7th Cir. 1995) (applying companionship exemption to home health aide); *McCune v. Or. Senior Servs. Div.*, 894 F.2d 1107 (9th Cir. 1990) (live-in attendants for elderly and infirm patients exempt from overtime requirements); *Armani*, 53 F. Supp. 2d 1120 (staffing company CNA held to be exempt from overtime requirements of FLSA). "Nurses, certified nurse aides, home health aides, and other individuals providing home health care services fall within the term 'domestic service employment' when they provide services in or about a private household." Ex. I, DOL Op. 2005-13.

Lawrence's employment as a certified HHA, providing basic companion services to patients in their private home, exempts her from the payment of overtime compensation during her employment with Maxim under the companionship services exemption. As such, Maxim is entitled to summary judgment on Lawrence's overtime claim.

### C.  Lawrence Did Not Qualify for Either Exception to the Companionship Services Exemption.

The FLSA provides that an employer cannot avail itself of the companionship exemption for any week in which: (1) the employee performs general household services unrelated to patient care in excess of 20% of the total weekly hours worked; and/or (2) the employee provides

services of a trained personnel "such as a registered or practical nurse." *Toth v. Green River Reg'l Mental Health/Mental Retardation Bd., Inc.*, 753 F. Supp. 216, 217 (W.D. Ky. 1989), *see also McCune*, 894 F.2d at 1111.  Lawrence did not fall into either category.

### 1. The "General Household Work" Provision Does Not Apply to Lawrence.

The "general household work" provision of the companionship services exemption provides that the exemption does not apply where "general household work" exceeds 20% of the total weekly hours worked. 29 C.F.R. § 552.6. The regulation distinguishes between "household work related to the care of the aged or infirm persons" and "general household work." *Id.*

Although not defined by the regulations, the term "general household work" has been clarified and defined by several courts.  In *McCune*, the court recognized that household work "related" to the care of the individual would not be counted toward the 20% threshold. *McCune*, 894 F.2d at 1111.  In determining whether household work is subject to the 20% limitation, several courts have considered a DOL opinion letter from March 16, 1995.  *Lamur v. Sunnyside Cmty. Servs., Inc.*, No. 11- 4439, 2012 WL 3288770 (E.D.N.Y. Aug. 9, 2012); *Torres v. Ridgewood Bushwick Senior Citizens Homecare Council Inc.*, No. 08- 3678, 2009 WL 1086935 (E.D.N.Y. Apr. 22, 2009).  The opinion letter states:

> [I]t is our opinion that such activities as cleaning the patient's bedroom, bathroom or kitchen, picking up groceries, medicine, and dry cleaning would be related to personal care of the patient and would be the type of household work that would be exempt work for purpose of section 13(a)(15) of the FLSA. However, activities involving heavy cleaning such as cleaning refrigerators, ovens, trash or garbage removal and cleaning the rest of a "trashy" house would be general household work or nonexempt work that is subject to the 20 percent time limitation.

Ex. J, Opinion Letter, Stephen E. Zweig, Department of Labor (Mar. 16, 1995), available at 1995 WL 1032475.  At least one court has characterized the test as "whether a particular task is

necessary for the care or habilitation training of a particular client.  If it is, then the task cannot be 'general household work' unrelated to the individual client, and it does not count toward the 20% exception.  Instead, the companionship exemption applies to the task, and the employer is not required to pay overtime wages to the plaintiff who performs it."  *Terwilliger v. Home of Hope, Inc.*, 42 F. Supp. 2d 1231, 1253 (N.D. Okla. 1999).

Similarly, in *Armani*, a CNA for Maxim claimed he was entitled to overtime for all hours worked caring for home-care patients over forty hours in a workweek.  *See Armani*, 53 F. Supp. 2d 1120.  The plaintiff was a licensed CNA (which is comparable to an HHA) who provided care to quadriplegic patients who largely could not care for themselves.  *See id*. at 1122.  The court held that the employee's normal work duties – medicating the patient, changing the patient, bathing the patient, cooking for the patient, feeding the patient, transporting the patient, house cleaning, helping the patient with his finances, and running errands for the patient – all related to the care of the patient and qualified him for the companionship services exemption.  *See id*.  Granting summary judgment in favor of Maxim on the plaintiff's overtime claim, the court held: "Reviewing Mr. Armani's duties in relation to the definition of 'companion services,' I conclude that they fall within the definition." *Id*. at 1126.  The facts here call for a similar conclusion.

     **a.**     ***There is No Dispute that More than 80 Percent of Lawrence's Work for Mr. ▮▮▮▮▮ and Ms. ▮▮▮▮▮ Was Directly Related to Their Care.***

With respect to Mr. ▮▮▮▮▮, Lawrence testified that the services she performed included preparing breakfast, cleaning up the kitchen after cooking, cleaning Mr. ▮▮▮▮▮ bedroom, doing Mr. ▮▮▮▮▮ laundry, ensuring walkways in the home were clear, and occasionally cleaning the bathroom Mr. ▮▮▮▮▮ used.  *See supra* at 8.  Any household work that Lawrence performed for Mr. ▮▮▮▮▮ was related to the care ordered by his medical providers in his plan of care.  Indeed, the Ohio District 5 Area Agency on Aging Purchase of

Service Authorization shows that the Area Agency on Aging specifically ordered "homemaker" services for Mr. ███ for six (6) hours per week.  Ex. A at ¶ 19; Ex. A-5.  Lawrence testified that she provided a wide variety of personal care and companionship services to Ms. ███, including bathing, hair care, skincare, dressing and undressing, assisting her as she moved between rooms, preparing dinner and snacks, and watching TV and talking with her.  *See supra* at 9-10.  She testified that she also cleaned Ms. ███ bedroom and the bathroom that she used, did Ms. ███ laundry, cleared walkways to ensure that Ms. ███ did not trip or fall, vacuumed, swept and/or mopped the rooms that the ███ used, took out the trash, and dusted every few days.  *See id*.  There is no genuine dispute that Lawrence performed either "personal care" or work directly related to such care for Ms. ███.  *See Salyer*, 83 F.3d at 787; *Cox*, 55 F.3d at 1306.  As Scott Thompson, Accounts Manager at Maxim's Mansfield, Ohio office, testified, "plans of care are patient driven;" therefore, if Lawrence followed the plan of care, "that would mean that the task that she's completing would be to benefit the patient in one way, shape or form or another."  Ex. B at 53.

> **b.**    ***The Services Lawrence Performed for the ███ Grandchildren and Other Household Tasks Unrelated to Care Did Not Exceed 20% of Her Time.***

Lawrence's claims that she also performed work for the ███ grandchildren, such as cooking meals, washing dishes, cleaning up spills, picking up shoes, food and trash, and doing ███ laundry, do not amount to much.  First, there is no evidence that Lawrence ever performed *wholly separate* work for the grandchildren.  Indeed, Lawrence testified that she did not cook any separate meals for the grandchildren; rather, she just cooked more of what she was already cooking for the ███ and occasionally made a more family-style meal, such as meatloaf and potatoes or spaghetti, so that there was a sufficient amount of food for the one or two grandchildren joining the ███ for the meal.  *See supra* at 10-11.  After preparing

meals, Lawrence cleaned the dishes used by the ████ and any grandchildren who were there and, therefore, just added some dishes to those she already was washing for the ████. *See id*.  Lawrence also testified that she occasionally did laundry for ████ together with laundry for the ████, since their clothes were "all in the same bin."  *See supra* at 12.

Thus, by Lawrence's own testimony, most additional effort that inured to the benefit of the grandchildren was tethered to work she already was performing for the ████.  Even had the grandchildren not been present in the home, Lawrence still would have been required to cook, wash the dishes, do laundry, and keep walkways clear for the ████.  And this additional effort, including any additional time spent cleaning up occasional juice spills or moving the grandchildren's shoes out of the walkways comprised a small fraction of Lawrence's work.[5]  Moreover, this was all time spent maintaining a clean, sanitary living space for the ████.  *See Nelms v. Kramer*, No. 10-627, 2012 WL 290306, at *3 (W.D. Tex. Jan. 31, 2012) (finding that that preparing meals and cleaning the guest bedroom and bathroom when patient's family members visited, although a benefit to the visiting family members, was "inextricably intertwined with providing fellowship, care, and protection" to the patient and to the extent these services constituted general household work, plaintiff's efforts contributed to her patient's enjoyment of life.); *see also Rodriguez v. Jones Boat Yard, Inc.*, No. 09-23195, 2010 WL 7325250 (S.D. Fla. July 26, 2010) adopted by, No. 09-23195, 2010 WL 7325249 (S.D. Fla. Oct. 25, 2010) aff'd, 435 F. App'x 885 (11th Cir. 2011) (some general housework such as meal preparation for patient and her occasional visitors, walking the dog, dusting furniture, and

---

[5] Indeed, there is no evidence in the record about how much incremental time it takes to add additional pieces of clothing to a washing machine or fold those additional items, or clean a bathroom to account for use by additional family members rather than the ████ alone.  Lawrence testified that doing dishes after a meal where grandchildren were present may take an additional 15 minutes. *See supra* at 8.  She also testified that making a meatloaf may take longer than other types of meals – approximately 30-40 minutes total to make (Ex. H at 190-191) – but did not testify as to how much incremental time it takes to add more ingredients for an extra serving or two of other types of meals for dinner or for breakfast.

sweeping or mopping the floor was related to the care of the patient).

Similarly, occasionally taking out the trash, cleaning the refrigerator, oven, or front door window does not take Lawrence outside the companionship services exemption.  As Holly Summers, a former RN Clinical Supervisor for Maxim, testified, depending on the circumstances, tasks such as taking out the trash and cleaning the oven or refrigerator may constitute patient care.  Ex. E at 25, 74-77.  For example, if a patient had ambulatory issues, the HHA's duties may include taking out the trash.  Ex. E at 74.  Also, if the HHA used paper towels or gloves while in the home and threw them in the trash, and also put wrappers in the trash from preparing a meal, taking the trash out may fall under "patient care."  *Id.* at 74-75.  Similarly, if the HHA spills something in the refrigerator, on the stove, or in the oven when preparing a meal for the patient, the HHA is expected to clean up the spill.  *Id.* at 75-77.  If "she's the one who [] was providing that particular type of care, it would be her responsibility to clean it up."  *Id.* at 77.  Moreover, there is no evidence in the record that these tasks took more than a negligible amount of time.

Even crediting Lawrence's estimates of the amount of time she spent performing various duties in the ███████ home, many of the duties Lawrence now claims to have performed in the home are conspicuously missing from the required, contemporaneous weekly notes, including any reference to grandchildren.

### 2.    The "Trained Personnel" Exception Does Not Apply to Lawrence.

Lawrence also does not qualify for the "trained personnel" exception to the companionship services exemption because she was not trained personnel "such as a registered or practical nurse."  *McCune*, 894 F.2d at 1109 (quoting 29 C.F.R. § 552.6).  Lawrence was at all times employed by Maxim as a "certified home health aide," and was never trained or licensed as a registered nurse or a licensed practical nurse.  *See Cox*, 55 F.3d at 1310 ("[W]e hold that a

domestic service employee who provides 'companionship services' within the meaning of 29 U.S.C. § 213(a)(15) will not qualify for overtime compensation under the "trained personnel" exception of 29 C.F.R. § 552.6 unless (1) that employee's position involves the provision of services required to be performed by someone with training comparable in scope and duration to that of a registered or practical nurse, and (2) the employee in fact has received such training").

### D.  Lawrence Cannot Sustain a Claim for "Off-the-Clock" Work.

In the Second Amended Complaint, Lawrence mentions in passing that "Defendant occasionally required [her] to work 'off the clock' without pay." Dkt. 42 at ¶ 27.  "The relevant knowledge [required for an off-the-clock claim] is not 'I know that the employee was working,' but 'I know the employee was working and not reporting his time.'"  *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 875 (6th Cir. 2012); *Raczkowski v. TC Const. Co.,* No. 91-56536, 1993 WL 385483, at *1 (9th Cir. 1993) (same; even though employer "might have seen [plaintiff] while he was allegedly working on unreported time," that is insufficient as "the issue is whether the employer knew that the time was unreported").  Thus, Lawrence must show that Maxim "had actual or constructive knowledge of [the] overtime work."[6]  *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 173, 177 (7th Cir. 2011); *see also* 29 U.S.C. §203(g), 29 C.F.R. §785.11.

"When [an] employee fails to follow reasonable time reporting procedures she prevents the employer from knowing its obligation to compensate the employee and thwarts the employer's ability to comply with the FLSA." *White*, 699 F.3d at 876.  Consequently, "where an employee elects to under-report his or her work time, the employer is not liable for the failure to

---

[6] The FLSA and Ohio Wage Act provide a private cause of action in two instances: (1) if employers fail to pay employees at or above a prescribed minimum wage; and (2) if employers fail to pay an overtime premium when employees work more hours in a particular workweek than the statutory threshold. *See* 29 U.S.C. §§ 206, 207, 215; Ohio Rev. Code §§ 4111.02, 4111.03. Thus, there is no statutory right to straight time wages. Plaintiff has not alleged that Maxim failed to pay her at least minimum wage for all hours worked.

pay unreported overtime under the FLSA." *Schremp v. Langlade Cty.*, No. 11-590, 2012 WL 3113177, at *2 (E.D. Wis. July 31, 2012); *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414-15 (9th Cir. 1981) ("[W]here the acts of an employee prevent an employer from acquiring knowledge, here of alleged uncompensated overtime hours, the employer cannot be said to have suffered or permitted the employee to work in violation of s [sic] 207(a).").

There is no record evidence to show that Maxim had actual or constructive knowledge of Lawrence's alleged failure to report a few minutes worked each day, other than Lawrence's bald assertion at her deposition that various Maxim personnel told her not to record any time worked outside her scheduled shift. *See supra* at 7. When confronted with payroll information showing that she did, in fact, record her time *to the minute*, Lawrence changed her tune and acknowledged that she accurately recorded her time worked and was paid for the hours she recorded. *See id.* Thus, even crediting Plaintiff's testimony that she failed to record a few minutes of work time each shift toward the end of her employment, what happened here was not a "failure by [the employer]" to keep accurate records or properly pay overtime, but "a failure by [the employees] to comply with [the employer's] timekeeping system." *Brown v. ScriptPro, LLC*, 700 F.3d 1222, 1230 (10th Cir. 2012).

Even apart from her failure to report her time, Lawrence cannot create a genuine issue of material fact sufficient to charge Maxim with knowledge of her alleged uncompensated work. Lawrence spent all of her work hours performing service inside her patients' home, and the vast majority of that time was unsupervised. Thus, Maxim could not have known if she was failing to record a few additional minutes worked, particularly when her weekly aide notes recorded her work time *to the minute*. Thus, although Lawrence has not clearly articulated an off-the-clock claim in her Second Amended Complaint, any such claim fails as a matter of law. *See, e.g.,*

*Wood v. Mid-Am. Mgmt. Corp.*, 192 F. App'x 378, 380 (6th Cir. 2006) (affirming summary judgment for the employer where the employee reported and was paid some overtime, finding the employer "had no reason to suspect that [plaintiff] neglected to report other overtime hours"); *Kellar*, 664 F.3d at 177 (finding employer had no reason to know of the employee's unpaid overtime hours where the employee did not inform anyone that she was working overtime in violation of express policies and never demanded proper compensation for the overtime); *Ekokotu v. Fed. Express Corp.*, 408 F. App'x 331, 340 (11th Cir. 2011) (affirming summary judgment for employer because plaintiff "has not demonstrated that any inadequate compensation was the result of [the employer's] actions, rather than his own").

> ### E. Lawrence's Ohio Prompt Pay Act Claim is Dependent Upon and, Therefore, Falls with Her Overtime Claim.

The Ohio Prompt Pay Act governs the *timing* of wage payments, not what wages are owed. *See* O.R.C. § 4113.15 ("Every individual, firm, partnership, association, or corporation doing business in this state shall, on or before the first day of each month, pay all its employees the wages earned by them during the first half of the preceding month ending with the fifteenth day thereof…"). Courts interpreting the statute have specifically held that it does not create a substantive right to the recovery of wages. Rather, to recover under the statute, Lawrence must establish a separate substantive legal right to the wages claimed. *See, e.g., Lacy v. Reddy Elec. Co.*, No. 11- 52, 2013 WL 3580309, at *17 (S.D. Ohio July 11, 2013) (stating that the viability of plaintiff's claim under the Ohio Prompt Pay Act "hinges on the viability of the minimum wage and overtime claims").

Lawrence does not contest the *timing* of the paychecks she received. Indeed, she acknowledged that Maxim promptly issued paychecks for the hours she recorded on her weekly aide notes. *See supra* at 7. Rather, Lawrence asserts that the paychecks improperly excluded

overtime pay for hours worked over 40 in a workweek in violation of the FLSA and Ohio Wage Act.  *See* Dkt. 42 at ¶¶ 75-76.  Because Lawrence has failed to establish that she is entitled to overtime wages under either statute, her Ohio Prompt Pay Act claim fails as a matter of law.  *See Lutz v. Huntington Bancshares Inc.*, No. 12- 01091, 2014 WL 2890170, at *20 (S.D. Ohio June 25, 2014) (granting employer's motion for summary judgment on Ohio Prompt Pay Act claim because it was dependent on plaintiff's failed overtime claim); *Lacy*, *supra*.

Further, even assuming that Lawrence had asserted a viable statutory right to the claimed unpaid overtime, Maxim disputes that it owes the wages Lawrence seeks.  This dispute, by itself, forecloses a cause of action under the Ohio Prompt Pay Act, as "§ 4113.15 expressly applies only to wages that are not in dispute."  *Lower v. Elec. Data Sys. Corp.*, 494 F. Supp. 2d 770, 775 (S.D. Ohio 2007).  *See also Baum v. Intertek Testing Servs.*, No. 13-1347, 2013 WL 6492372, at *4 (N.D. Ohio Dec. 10, 2013) ("the Complaint indicates that a dispute exists between the parties as to [unpaid wages'] existence . . . making O.R.C. § 4113.15 inapplicable.").

## IV.    CONCLUSION

For all of the foregoing reasons, Maxim is entitled to summary judgment on Lawrence's claims for overtime under the FLSA and the Ohio Wage Act, and her claim under the Ohio Prompt Pay Act.

WHEREFORE, Maxim respectfully requests that this Court grant summary judgment in Maxim's favor and dismiss Plaintiff's Complaint in its entirety with prejudice, and award it its reasonable attorneys' fees and costs incurred in defending this action.

Dated: October 28, 2015                              MAXIM HEALTHCARE SERVICES, INC.


                                                     By: */s/ Stephanie L. Sweitzer*
                                                         One of Its Attorneys

Thomas F. Hurka (Admitted *pro hac vice*)
Stephanie Sweitzer (Admitted *pro hac vice*)
Mary Ellen Vales (Admitted *pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive, 5th Floor
Chicago, Illinois  60601

David A. Campbell, III
Liana R. Hollingsworth
VORYS, SATER, SEYMOUR & PEASE
2100 One Cleveland Center
1375 East Ninth Street
Cleveland, Ohio  44114

*Attorneys for Defendant Maxim Healthcare
Services, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 28, 2015, Memorandum of Points and Authorities in Support of Defendant Maxim Healthcare Services, Inc.'s Motion for Summary Judgment was filed electronically via the Court's Electronic Case Filing system, which in turn provided service on the following:

Jesse L. Young
Jason J. Thompson
Sommers Schwartz
2000 Town Center, Ste. 900
Southfield, MI  48075
248-355-0300
Fax:  248-746-4001

Timothy J. Becker
Jacob R. Rusch
Johnson Becker
33 South Sixth Street, Ste. 4530
Minneapolis, MN  55402
612-436-1800
Fax:  612-436-1801

Robert E. DeRose, II
Barkan Meizlish Handelman Goodin DeRose Wentz
250 East Broad Street, 10th Floor
Columbus, OH  43215
614-221-4221
Fax:  614-744-2300

David A. Campbell, III
Liana R. Hollingsworth
Vorys, Sater, Seymour & Pease – Cleveland
2100 One Cleveland Center
1375 East Ninth Street
Cleveland, OH  44114
216-479-6100
Fax:  216-479-6060

*/s/ Stephanie L. Sweitzer*
Stephanie L. Sweitzer